R.A. MACKIE & CO., L.P. and Wien Securities Corp., Plaintiffs,

v.

PETROCORP INCORPORATED and Petrocorp Acquisition Corporation, as successors in interest to Southern Mineral Corporation, and as individual corporations, Defendants.

No. 02 Civ.1984(JGK).

United States District Court, S.D. New York.

Aug. 9, 2004.

Sabrina R. Bagdasarian, Frederic Dorwart, William A. Maher, J. Michael Medina, Wollmuth, Maher & Deutsch, LLP, New York, NY, Steven Kobos, Tori M. Snyder, Frederic Dorwart, Lawyers, Tulsa, OK, for Petrocorp Acquisition Corp., Petrocorp Inc.

Timothy P. Kebbe, Brunelle & Hadjikow, P.C., New York, NY, for R.A. Mackie & Co., L.P., Wien Securities Corp.

### OPINION and ORDER

KOELTL, District Judge.

This case arises out of the alleged breach of, and tortious interference with, the Series B Perpetual Warrant Agreement dated September 29, 2000 (the "Warrant Agreement") between Southern Min-

eral Corporation ("Southern Mineral") and American Stock Transfer and Trust Company ("AST"). The plaintiffs, R.A. Mackie & Co., L.P. ("RAMLP") and Wien Securities Corp. ("WSC"), are purchasers of the Series B Perpetual Warrants (the "Warrants") issued under the Warrant Agreement.

PetroCorp Incorporated and PetroCorp Acquisition Corporation (collectively "PetroCorp") merged with Southern Mineral on June 6, 2001. PetroCorp is the successor-in-interest to Southern Mineral under the Warrant Agreement. *See R.A. Mackie & Co., L.P. v. PetroCorp Inc.,* 244 F.Supp.2d 279, 282 (S.D.N.Y.2003) (*"Mackie I"*). The action was originally commenced in the Supreme Court of the State of New York, New York County. The defendants timely removed the action to this Court, on the grounds of complete diversity of citizenship, by filing a Notice of Removal on March 1, 2002.[1]

The essence of the dispute between the parties is that the plaintiffs, purchasers of the Warrants, contend that the Warrants were by their terms "perpetual," and that the Warrants therefore could not be required to be redeemed. The plaintiffs contend that Southern Mineral violated the terms of the Warrant Agreement when it merged into PetroCorp because the only way that the Warrant holders could receive the merger consideration given to all other Southern Mineral stockholders was to exchange their Warrants for Southern Mineral stock before the merger. If the Warrant holders did not exchange their Warrants, their Warrants thereafter would only be redeemable for $.50, the difference between the $4.71 value of the Southern Mineral stock and the $4.21 exercise price

for each Warrant, effectively freezing the consideration to be paid for the Warrants and preventing any appreciation. PetroCorp contends that this was consistent with the terms of the Warrant Agreement. The plaintiffs contend that Southern Mineral breached the terms of the Warrant Agreement by eliminating the provision of the Warrants which made them perpetual and that PetroCorp as the successor to Southern Mineral is liable for that breach. Further, the plaintiffs contend that PetroCorp intentionally interfered with the Warrant Agreement and caused its breach.

The Court conducted a non-jury trial on February 24, 25, and 26 and March 1 and 2, 2004. Having heard the testimony of the witnesses, and having assessed their credibility, and having reviewed the exhibits in evidence, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### The Parties

1. RAMLP is a Delaware limited partnership with its principal place of business located in Irvington, New York. R.A. Mackie & Co., Inc. ("Mackie & Co.") is the general partner of RAMLP. Mackie & Co. is a New York corporation, having its principal place of business located in Irvington, New York. The sole limited partner of RAMLP is Robert A. Mackie ("Mackie"), a citizen of the State of New York. (Amended Joint Pretrial Order ("AJPO") ¶ iii(b).) Mr. Mackie is president and sole owner of Mackie & Co. (Tr. at 613 (Mackie).) RAMLP is engaged in the business of warrant trading, hedge trading and se-

---

**1.** During trial, PetroCorp's former President and Chief Executive Officer, Gary Christopher ("Christopher"), testified that PetroCorp Acquisition Corporation ("PAC") previously merged into PetroCorp Incorporated. (Tr. at 138 (Christopher).) Because various papers in the case refer to both defendants, the caption has not been changed.

curities arbitrage. (Tr. at 377 (Bridges), 448 (Bridges); Tr. at 605–07 (Mackie).)

2. WSC is a New Jersey corporation with its principal place of business located in the State of New Jersey. (AJPO ¶ 3(c).) Stephen Rose ("Rose"), Manager of WSC's Arbitrage Department, engaged in the business of warrant trading and hedge trading on behalf of WSC. (Tr. at 496–500 (Rose).)

3. Defendant PetroCorp Incorporated is a Texas corporation with its principal place of business located in Tulsa, Oklahoma. (AJPO ¶ iii(d).) [2] Defendant PAC was a wholly owed subsidiary of PetroCorp Incorporated. (PX15 at p. 58.) PAC was formed for the purpose of acquiring Southern Mineral. (PX15 at I–1–I–2.) Prior to its merger into PetroCorp Incorporated, PAC was a Delaware corporation with its principal place of business located in Tulsa, Oklahoma. (AJPO ¶ 3(e).)

4. According to its Form 10–K for the fiscal year ended December 31, 2001, PetroCorp is "engaged in the acquisition, exploration and development of oil and gas properties, and in the production of oil, natural gas liquids and natural gas in North America." (PX26 at p. 2.) In accordance with the Agreement and Plan of Merger between PetroCorp and Southern Mineral, dated as of December 22, 2000, as amended (the "Merger Agreement"), PetroCorp is the successor-in-interest to Southern Mineral, and Petro Corp has assumed Southern Mineral's obligations under the Warrant Agreement. (PX15 at I–2 § 1.1; *Mackie I*, 244 F.Supp.2d at 282.)

*Background*

5. In connection with its emergence from a Chapter 11 bankruptcy proceeding in July 2000, Southern Mineral issued to its "current common shareholders, option holders, and warrant holders of record on July 24, 2000 ... approximately 3,667,000 warrants allowing them to increase their ownership from 22% to up to 40% of [Southern Mineral's] outstanding common stock." (PX30 at p. 7; *see also* PX35 at pp. 70–72; Tr. at 548 (Mikel).) These Series B Perpetual Warrants (the "Warrants") were "for a perpetual term with an exercise of $4.21 per share, subject to adjustment for certain customary anti-dilution stock splits, stock dividends and other recapitalization events." (PX30 at p. 7; *see also* PX1 §§ 1.1, 2.1, 2.2, 3.3; PX35 at p. 71; PX32 at p. 1.) The phrase "adjustment for ... customary recapitalization events" encompasses "mergers." (Tr. at 281–82 (Buck); Tr. at 388 (Bridges).)

6. The Warrants began trading on the NASD's Over–the–Counter Bulletin Board on October 16, 2000 and were delisted from the Bulletin Board on June 7, 2001, one day after Southern Mineral's merger into PetroCorp was consummated. (*Mackie I*, 244 F.Supp.2d at 282.)

*The Warrant Agreement*

7. The Warrant Agreement states that it is made between "Southern Mineral Corporation ... (including its successors and permitted assigns, the "Company") and American Stock Transfer & Trust Company...." (PX1 at p. 1.) The Warrant Agreement provides that each Warrant issued thereunder "entitles its holder to purchase from the Company one share of Common Stock at $4.21 per share, subject to adjustment as provided in Article III [thereof]." (PX1 § 2.1.) Section 6.10 of the Warrant Agreement states that "[a]ll the covenants and provisions of this Agreement by or for the benefit of the Company

---

**2.** On January 30, 2004, PetroCorp was sold through merger to Unit Corporation. (Tr. at 137 (Christopher).)

or the Warrant Agent or the holders of the Warrant Certificates shall bind and inure to the benefit of their respective successors and assigns hereunder." (PX1 § 6.10.) Under the plain text of the Warrant Agreement, the Warrants were exercisable into the common stock of Southern Mineral and its successors, which includes PetroCorp. The Warrant Agreement is binding on Southern Mineral, PetroCorp, and the plaintiffs, as well as the successors and assigns of each party.

8. With respect to the duration of the Warrants, the Warrant Agreement states that the Warrants "are perpetual; that is, the Warrants will not expire." (PX1 § 2.2; Tr. at 280 (Buck) ("the perpetual nature of the warrant ... by definition, does not have an expiration date").) The Warrants' perpetual duration was a unique and unusual feature for warrant agreements. David C. Buck, an attorney at Andrews & Kurth which represented the Creditors Committee of Southern Mineral, asked Southern Mineral's bankruptcy attorneys at Akin, Gump, Strauss, Hauer & Feld, LLP ("Akin Gump") whether the perpetual term of the Warrants was permissible because he had never encountered a perpetual warrant before. (Tr. at 285–86 (Buck).) The witnesses at trial testified that the Warrants' perpetual duration was a unique feature that they had not previously encountered in a warrant agreement. (Tr. at 112–13 (Berlin); Tr. at 213–214 (Lemmer); Tr. at 279 (Buck), 284–285 (Buck); Tr. at 625 (Mackie).) The witnesses also testified, however, that other than its perpetual duration, the Warrant Agreement did not contain unusual or unique features. (Tr. at 279 (Buck); Tr. at 724 (Mackie).)

9. The perpetual term of the Warrant could not be terminated "[w]ithout the agreement of the [W]arrant holders or the other parties to the [W]arrant." (Tr. at 281 (Buck).) Under the terms of the Warrant Agreement, the Warrants could not be called, redeemed or extinguished; nor could any action of Southern Mineral or PetroCorp cause the expiration of the Warrants. (*Mackie I*, 244 F.Supp.2d at 282; PX1 § 2.2.)

10. Section 3.3 of the Warrant Agreement is central to the outcome of this action. Section 3.3 provides, in relevant part:

> Section 3.3 *Reorganization, Merger and Asset Sales.* If after the date hereof any ... merger involving the Company ... shall be effected, then, as a condition of such ... merger ... lawful and fair provision shall be made whereby the Warrant Certificate holders shall thereafter have the right to purchase and receive upon the basis and upon the terms and conditions specified in the Warrant Certificates and in lieu of the shares of Common Stock of the Company immediately theretofore purchasable and receivable upon the exercise of the Warrants represented thereby, such shares of stock, securities, or assets as may be issued or payable with respect to or in exchange for a number of outstanding shares of such Common Stock equal to the number of shares of such stock immediately theretofore purchasable and receivable upon the exercise of the Warrants had such ... merger ... not taken place, and in any such case appropriate provision shall be made with respect to the rights and interests of the Warrant Certificate holders to the end that the provisions hereof (including, without limitation, provisions for adjustments of the Warrant Price and of the number of shares purchasable upon the exercise of the Warrants) shall thereafter be applicable, as nearly as may be in relation to any share of stock, securities,

or assets thereafter deliverable upon the exercise hereof.... (PX1 § 3.3)

11. In addition, the Warrant Agreement provides: "Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the holders of the Warrant Certificates any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof, and all covenants, conditions, stipulations, promises, and agreements in this Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and the holders of the Warrant Certificates." (PX1 § 6.13.)

*Evidence Concerning the Meaning of Section 3.3 of the Warrant Agreement*

12. Subsequent to Southern Mineral's emergence from bankruptcy and prior to execution of the Warrant Agreement, John Goodgame ("Goodgame"), then an associate attorney at Akin Gump, wrote an August 21, 2000 e-mail to Steve Mikel, the President of Southern Mineral. This e-mail enclosed a draft of the Warrant Agreement and Warrant Certificate. (Tr. at 40–41 (Goodgame), 61–64 (Goodgame); PX29.) Mr. Goodgame was principally involved in drafting the Warrant Agreement; he was assigned to that project by J. Vincent Kendrick ("Kendrick"), a partner at Akin Gump. (Tr. at 43–47 (Goodgame).) To create the Warrant Agreement at issue here, Mr. Goodgame modified a pre-existing Southern Mineral warrant agreement that had been part of a previous transaction. (Tr. at 46–47 (Goodgame); PX29; PX45.)

13. Section 3.3 of the Warrant Agreement came from—and used almost the exact language from—prior Southern Mineral Warrants called the "Amerac warrants." (PX45; PX1; PX29; PX93.)

14. Mr. Goodgame's August 21, 2000 e-mail to Mr. Mikel stated:

Attached for your review and comment are the following draft documents:

Series B Perpetual Warrant Certificate; and Series B Perpetual Warrant Agreement.

We have assumed that you will want American Stock Transfer & Trust to serve as Warrant Agent; please note that the Warrant Agreement will need to be reviewed and agreed to by the Warrant Agent as soon as possible.

Please call me with any questions or comments.

(PX29 at p. 1.)

15. The draft Warrant Agreement attached to Mr. Goodgame's e-mail contained a provision (Section 3.4) addressing the treatment of the Warrants in reorganizations, mergers, asset sales and other like events. (PX29.) Section 3.4 was incorporated in its entirety as Section 3.3 in the final, executed version of the Warrant Agreement. (PX1 § 3.3, PX29 § 3.4.)

16. Mr. Mikel responded to Mr. Goodgame by e-mail sent on August 21, 2001 at 9:06 a.m. Mr. Mikel stated:

Please forward a draft to AST & T for their review and comment. I do not believe that we need Section 3.3 [Special Stock Dividends]. In addition, confirm for me that the effect of Section 3.4 is that upon a merger or other exchange for shares, the warrants are exchanged into the underlying common prior to the exchange; the warrants do not flow through and remain a perpetual part of the acquiring entity's capital structure.

They need to be extinguished when we do a deal.

(PX29 at p. 1.)

17. Mr. Goodgame answered Mr. Mikel's inquiry with a further e-mail sent on August 21, 2000 at 3:33 p.m. Mr. Goodgame's reply stated:

We'll forward a draft to AST & T shortly. The effect of Section 3.4 is, upon a merger (or other similar transaction), the warrants effectively convert from being convertible equity securities into being rights to convert into their 'share' of the merger consideration. *In other words, in a merger, a warrant would become the right to receive from the acquiring company stock (or cash, in a cash-out transaction) equal to the amount the warrant holder would have received had he converted immediately prior to the merger.* The warrants would not be "equity securities" of the acquiror, but rather rights to receive merger consideration. *The timing of the receipt, though, would still be up to the warrant holder.* Incidentally, we talked to Roy [Stroube] about this concept and he indicated that it was in line with the Order.

As to Section 3.3, we agree that you may not want it in the document. We included it, though, and marked it for discussion, because it was in a previous Southern Mineral warrant, and we were not certain whether deleting it was worth the potential questions that might arise. Does its presence in the previous warrant change your analysis?

(PX29 at p. 1 (emphasis added).)

18. At his deposition, which was read into evidence without objection at trial, Mr. Goodgame elaborated on his reply to Mr. Mikel's e-mail as follows:

Q. In his e-mail to you, Mr. Goodgame, [Mr. Mikel] asked you to confirm that the effect of Section 3.4—now 3.3—is that upon merger or other exchange for shares the warrants are exchanged into the underlying common prior to the exchange and the warrants do not flow through or remain a perpetual part of [the] acquiring [entity's] capital structure. My question to you is in your reply did you attempt to confirm that for him?

A. I don't think that my reply—I don't think that you could read my reply as being a yes to him. I think you could read my reply as being a response of maybe you don't understand how these work. Here's how they work.

Q. Mr. Goodgame, the last sentence of Mr. Mikel's e-mail to you is, 'they,' referring to the warrants, 'need to be extinguished when we do a deal.'

A. Uh-huh.

Q. Did you, in your commentary or in your response to his e-mail, did you comment upon that, upon the statement by Mr. Mikel?

A. What I said was I didn't use the words extinguished or otherwise. What I said was, to paraphrase my language, *they are not extinguished rather they convert from being convertible equity securities into rights to convert into their share of the merger consideration.*

*So, I suppose I did not answer his question directly by saying they are not extinguished but I answered his question by saying here is what happens.*

Q. They become rights to receive merger consideration?

A. Correct. In the context of whatever common stock would have been able to—would have been entitled to.

(Tr. at 62–64 (Goodgame) (emphasis added).)

19. Mr. Goodgame's August 21, 2001 e-mail at 3:33 p.m., along with the other testimony and evidence at trial, establish that the Warrants became rights to receive merger consideration, at a time of the Warrant holders' choosing, in the context of whatever consideration Southern Mineral's common stockholders would have been entitled to receive in the merger.

20. Concerning the meaning of Section 3.3, Gary Christopher, the President and Chief Executive Officer of PetroCorp, testified that "the warrant holder was entitled to receive whatever the common shareholder owned or was entitled to receive at the time of the exercise." (Tr. at 133 (Christopher).) Mr. Christopher understood that Section 3.3 gave the Warrant holders the right to convert their Warrants into whatever merger consideration to which the Southern Mineral shareholders were entitled for the duration of the Warrants. (Tr. at 139 (Christopher).)

21. Mr. Christopher also testified that he believed the following statement in PetroCorp's attorneys' January 22, 2001 e-mail, (PX54), describing the Warrants was accurate: "In the event of any merger, such as the merger of Southern Mineral into [PAC], the [W]arrants represent the right to receive the securities and assets as the holders of Southern Mineral common stock receive in the merger." (Tr. at 166 (Christopher).) Mr. Christopher had no doubt that the timing of the receipt of the merger consideration would be up to the Warrant holders. (Tr. at 163–64 (Christopher).)

22. Herbert J. Lemmer ("Lemmer"), AST'S General Counsel, executed the Warrant Agreement on behalf of AST. (PX1 at p. 13; Tr. at 210–12 (Lemmer).) AST

acted as warrant agent for the Warrants. (PX1; Tr. at 210 (Lemmer).)

23. Mr. Lemmer read the entire Warrant Agreement, including Section 3.3, before he executed it and recognized Section 3.3 as a standard provision found in warrant agreements to protect the issuer and the warrant holders. (Tr. at 212, 218, 239 (Lemmer).) [3] Mr. Lemmer testified that Section 3.3:

> . . . gives the issuer the right to merge so that a warrant holder cannot turn around and say, issuer, you cannot merge because by merger you are wiping out the stock that I'm entitled to exercise my warrant for.
>
> And, similarly, it protects the warrant holder so that the issuer cannot come along and say sorry, there is no more stock that you are entitled to exercise your warrant for.

(Tr. at 212–13 (Lemmer).)

24. Mr. Lemmer used several examples to illustrate the effect of Section 3.3 in a merger:

> If, in a particular deal you have a share for share deal, so let's say Petro and this company was acquiring Southern Mineral and each Southern Mineral share would become entitled to receive one Petro share, then the warrant would, in the future, be exercisable for one Petro share. If the consideration was cash, $5 a share, then the warrant would be exercisable into $5 of cash. You could also have a combination, let's say the warrants—the consideration was half a share of Petro and $2.50, then on an ongoing basis the warrant would be exercisable for half a share plus $2.50.

(Tr. at 213 (Lemmer).)

25. According to Mr. Lemmer, the Warrant Agreement did not contain a

---

**3.** Mr. Lemmer testified as to his understanding of Section 3.3 based on his reading of the document before he signed it and not as an expert witness. Nor did Mr. Lemmer offer a legal opinion with respect to Section 3.3. (Tr. at 214–16 [Lemmer], 227 [Lemmer], 236 [Lemmer]) Mr. Lemmer testified as a fact witness.

provision giving Southern Mineral or PetroCorp the "ability to cut off the right to receive the merger consideration, whatever that is, and this is a perpetual warrant." (Tr. at 213 (Lemmer).)

26. Mr. Buck's testimony concerning the language of Section 3.3 of the Warrant Agreement echoed that of Mr. Lemmer. Mr. Buck testified that Section 3.3 "provide[d] for the continued exerciseability of the [W]arrant after the specified transaction into the consideration specified." (Tr. at 291 (Buck).) Similarly, Mr. Buck testified that Section 3.3 "confers rights to the [W]arrant-holder to continue to be able to exercise the [W]arrant into the consideration that the common stockholders receive in connection with a transaction." (Tr. at 298 (Buck); see also 304 (Buck).) Mr. Buck also testified that "[t]he purpose of [Section 3.3] is to not require [W]arrant holders to exercise [to] be entitled to the same shares of stock, securities or assets as may be issued or payable [to Southern Mineral's common shareholders]." (Tr. at 311 (Buck).)

27. Like Mr. Lemmer, Mr. Buck did not have any understanding that the option feature of the Warrants would not extend beyond the time of a merger, consolidation or other so-called exit transaction. (Tr. at 311–12 (Buck).) Indeed, the Warrant Agreement itself states that the Warrants would be perpetual in duration, and the Warrant Agreement does not provide, implicitly or explicitly, for an "exit transaction" or "value realization event" that would terminate the perpetual duration of the Warrants, as the defendants argued at trial.

28. RAMLP and WSC's representatives' testimony concerning Section 3.3 was consistent with that of the other witnesses. For example, Mr. Mackie testified that the plain language of Section 3.3 required the Warrants to remain exercisable into equity of an acquiring corporation where equity was offered as part of the merger consideration. (Tr. at 632–34 (Mackie).) Mr. Rose testified that the text of Section 3.3 required that upon "any change in the structure of the common shares of the company, my warrants would be protected so that I would receive or have the right to receive the same consideration, value or shares that I was able to receive when the issue first came out as I was able to receive after this change in structure that which I would have been able to receive before the change happened." (Tr. at 503 (Rose); see also Tr. at 383 (Bridges) ("I also noticed—3.3 concerning what we referred to as an anti-dilution or anti-destruction clause, ensuring the life, the survivability of the [W]arrant in case of certain activities").)

29. There was some testimony concerning the meaning of the word "immediately" as that term is used in Section 3.3 of the Warrant Agreement. The use of that term does not alter the perpetual nature of the Warrants. The word "immediately" does not limit the merger consideration into which the Warrant holders were able to exercise their Warrants or enable Southern Mineral or its acquirer to place a time limit on the Warrant holders' ability to exercise their Warrants into any form of merger consideration to which Southern Mineral's shareholders were entitled. (Tr. at 213–214, 216–18 (Lemmer); Tr. at 293–96 (Buck); Tr. at 504–05 (Rose).) Rather, the provision that, in the event of a merger, the warrants are convertible into the "number of outstanding shares of such common stock equal to the number of shares of such stock immediately theretofore purchasable and receivable upon the exercise of the warrants had such ... merger ... not taken place," is a means of taking into account the mathematical ad-

justments made to the exercise feature of the Warrant—*e.g.*, stock dividends, stock splits and aggregations of Southern Mineral stock, (PX1 §§ 3.1, 3.2)—occurring during the Warrants' term prior to a merger. (Tr. at 504–05 (Rose).) Thus, "instead of having the right to purchase shares of Southern Mineral [the Warrant holders] would have the right to purchase whatever the merger consideration was," (Tr. at 217 (Lemmer)), after taking into account prior mathematical adjustments in the exercise feature of the Warrants (PX1 § § 3.1, 3.2; Tr. at 293–95 (Buck).)

30. The plain language of Section 3.3, and testimony and documentary evidence concerning that Section, establish that under the Warrant Agreement, the Warrant holders were entitled to exercise their Warrants—at a time of their choosing after the merger—into the same merger consideration offered to Southern Mineral's shareholders.

### The Warrant Certificate

31. The Southern Mineral Series B Perpetual Warrant Certificate (the "Warrant Certificate") states, in part:

This Warrant Certificate certifies that, [    ] (including its successors, the "HOLDER"), is the holder of [    ] Series B Perpetual Warrants ("WARRANTS"), each of which entitles such Holder to purchase, at any time, one share (as adjusted) of common stock, par value $0.01 per share ("COMMON STOCK"), of Southern Mineral Corporation, a Nevada Corporation (the "COMPANY"), as such stock is constituted at the date of this warrant, at the price of $4.21 per share....

This Warrant Certificate is issued under and in accordance with the Series B Perpetual Warrant Agreement dated as of [    ], 2000 (the "WARRANT AGREEMENT"), between the Company and the Warrant Agent and is subject to the terms and provisions contained in such Warrant Agreement, to all of which terms and provisions the Holder consents acceptance hereof.

(PX2 at p. X–10.)

32. The witnesses at trial testified that the Warrant Certificate: (a) does not create any contract rights or obligations for the issuer of the Warrants or the Warrant holders; and (b) that Warrant Certificate is merely evidence of ownership of the Warrants. (Tr. at 58–59 (Goodgame); Tr. at 297 (Buck); Tr. at 381 (Bridges); Tr. at 505 (Rose).) Mr. Buck testified that the rights of the Warrant holders stem from the Warrant Agreement itself. (Tr. at 297 (Buck); *see also* Tr. at 291 (Buck) ("[A] warrant agreement ... represents the warrants. So the warrants in essence are the same thing as this agreement.").) In any event, the Warrant Certificate was subject to the terms and conditions of the Warrant Agreement discussed above.

33. Purchasers of Southern Mineral's Warrants did not receive a Warrant Certificate unless they specifically requested one be sent to them. (Tr. at 505–06 (Rose).)

### The Southern Mineral–PetroCorp Merger

34. On December 22, 2000, Southern Mineral and PetroCorp entered into the Merger Agreement. *Mackie I*, 244 F.Supp.2d at 282. The Merger Agreement contained the following relevant terms addressing the treatment of Southern Mineral's shareholders and Warrant holders in the merger:

[Section 1.5] (c) Subject to *Sections 1.5(b), 1.6, 1.7, 1.8* and *1.12*, each issued and outstanding share of Company Common Stock not cancelled pursuant to *Section 1.5(b)* will be converted into one of the following....

(i) for each such share of Company Common Stock (other than shares as to

which a Stock Election (as defined in *Section 1.6(a)* has been effectively made and not revoked or lost pursuant to Section 1.6)), the right to receive an amount in cash, without interest (collectively, the *"Cash Consideration"*), equal to $4.71, (the *"Per Share Merger Consideration"*); or

(ii) at the election of the holder thereof, for each such share of Company Common Stock as to which a Stock Election has been effectively made and not revoked or lost, the right to receive a number of shares of Parent Common Stock equal to the Exchange Ratio (collectively, the *"Stock Consideration"*; the aggregate Cash Consideration and Stock Consideration issued to all of Company's shareholders in connection with the Merger will be referred to as the *"Aggregate Merger Consideration"*). The *"Exchange Ratio"* will equal the Per Share Merger Consideration divided by 10.

\* \* \* \* \* \*

Section 1.6 *Company Common Stock Elections.* Subject to *Sections 1.5, 1.7* and *1.8,* each holder of shares of Company Common Stock (other than holders of shares to be canceled as set forth in *Section 1.5(b)* ) will have the right to submit a request specifying the number of shares of Company Common Stock which such holder desires to have converted into the right to receive either Stock Consideration or a combination of Stock Consideration and Cash Consideration in accordance with the following procedures:

(a) Each holder of shares of Company Common Stock may specify in a request made in accordance with the provisions of this *Section 1.6* the number of such shares which such holder desires to have converted into the right to receive Stock Consideration in the Merger (a. *"Stock Election"*). Each share of Company Common Stock as to which no Stock Election is in effect at the Stock Election Final Date (as defined in *Section 1.6(e)* ) or for which a Stock Election has been made but has been revoked or withdrawn or is otherwise no longer effective will be called a *"Non–Electing Share."* Subject to *Sections 1.7* and *1.8,* the Non–Electing Shares of each holder of shares of Company Common Stock will be treated for purposes of this Agreement as if such shares were not covered by a Stock Election and, accordingly, will be converted to the right to receive Cash Consideration in accordance with *Section 1.5(c)(i)* ....

(e) A Stock Election will have been properly made only if the Exchange Agent will have received, by 5:00 p.m., New York City time, on the twentieth day (or a later date which may be determined prior to the Stock Election Mailing Date by mutual agreement of Parent and Company) following the date of mailing of the Form of Stock Election (such time on such day being referred to herein as the *"Stock Election Final Date"*), a properly completed and signed Form of Stock Election. *A holder of Warrants that (i) receives a Form of Stock Election, (ii) exercises Warrants in accordance with the applicable warrant agreement after receipt of such Form of Stock Election but prior to the Stock Election Final Date, and (iii) otherwise delivers such Form of Stock Election in accordance with this* Section 1.6(e) *with respect to the shares of Company Common Stock issuable under such Warrant, will have made a Stock Election with respect to such shares of Company Common Stock issuable under such Warrant if, and only if, such shares are issued to such holder on or prior to the Stock Election Final Date*

*so that such holder is the record holder of such shares on the Stock Election Final Date....*

(PX15 pp. I–3 and I–5 (italics in original) (emphasis added).)

35. By Joint Prospectus and Proxy Statement, dated April 3, 2001 and first mailed to shareholders on or about April 9, 2001 (the "Joint Prospectus"), (PX15 at p. 1), Southern Mineral and PetroCorp explained their treatment of Southern Mineral's shareholders and Warrant holders in the merger. The Joint Prospectus stated:

Q. What will happen to Southern Mineral shares in the merger?

A. In exchange for each share of Southern Mineral stock, Southern Mineral shareholders will receive merger consideration of $4.71 in cash or, if the shareholder timely elects, in PetroCorp common stock based on an exchange ratio of .471, subject to possible proration as a result of oversubscription for PetroCorp stock, as described below....

Q. Can Southern Mineral warrant holders receive PetroCorp stock in the merger?

A. **Southern Mineral warrant holders can receive PetroCorp stock in connection with the merger only if, prior to the expiration of the merger stock election period, they exercise their warrants (including paying the applicable exercise price) and, as shareholder, make a valid stock election as provided in the merger agreement.** In accordance with the terms of the Southern Mineral warrants, if the merger is completed, PetroCorp will assume each Southern Mineral warrant outstanding immediately prior to the merger and holders of those warrants will be entitled to receive, after payment of the applicable exercise price, for each share of Southern Mineral stock underlying such warrant, the per share merger consideration in cash, without interest.

(PX15 at pp. 1–2 (emphasis in original).) [4]

36. By notices to its shareholders and Warrant holders, dated May 8, 2001, Southern Mineral implemented the Merger Agreement and Joint Prospectus. (PX31, PX33.) The notices stated that Southern Mineral and PetroCorp expected the merger to close on or about May 30, 2001. Both notices contained a "Stock Election Form." (PX31, PX33.) The notice to shareholders required those shareholders seeking PetroCorp stock in the merger to execute and return the Stock Election Form—listing the "number of shares of Southern Mineral common stock for which shares of PetroCorp common stock are elected," (PX31 at p. 2)—so that it would be received by May 29, 2001 at 5 p.m. (PX31 at p. 1.)

37. The notice to Warrant holders described the mechanics of the merger as they pertained to the Warrant holders as follows:

**Southern Mineral warrant holders can receive PetroCorp stock in connection with the merger only if, prior to the expiration of the merger stock election period, they exercise their warrants (including paying the applicable exercise price) and, as a shareholder, make a valid stock election as described below. In the event the merger is not consummated, warrant**

---

**4.** Mr. Christopher testified that PetroCorp had a "walk right" if Southern Mineral's shareholders—including those Warrant holders that elected to convert their Warrants into Southern Mineral stock before the merger—did not elect to receive at least 3 million PetroCorp shares. (Tr. at 159–60 (Christopher); PX15 at p. 1.)

**holders will be afforded the opportunity to rescind their exercise and remain as warrant holders.**

We have enclosed the forms by which you may elect whether you would like to receive PetroCorp stock if the merger is consummated. Southern Mineral shareholders who wish to receive PetroCorp stock in the merger must duly execute and timely deliver a stock election form. Such forms must be completed and delivered to the warrant agent, American Stock Transfer & Trust Company no later than 5:00 p.m., New York City time on May 29, 2001.... If you, as a Series B Perpetual Warrant holder, wish to make a stock election you must:

- exercise, in whole or part, your warrant, by surrendering your warrant certificate to the warrant agent with a duly executed and timely delivered subscription form, located on the back of your warrant certificate, including payment in full of the warrant price of $4.21 per full share of Southern Mineral common stock and any applicable taxes; and

- Deliver a duly executed stock election form ... with respect to the shares issuable under your warrant no later than 5 p.m., New York City time on May 29, 2001.

In order for you to receive PetroCorp stock in the merger, your warrant certificate, including a duly executed and timely delivered subscription form, and an election form must be delivered to the warrant agent, American Stock Transfer & Trust Company no later than 5:00 p.m., New York City time on May 29, 2001. We are not obligated to accept any forms received after the deadline, but we reserve the right to do

so. You may deliver both a duly executed subscription form with your warrant certificate and a duly executed stock election form to the warrant agent at the same time or separately, *however,* if you deliver such forms separately, the duly executed subscription form accompanied by your warrant certificate must be delivered to the warrant agent prior to the stock election form....

(PX33 at p. 2 (emphasis and italics in original).)

38. By press release dated May 22, 2001, (PX39), Southern Mineral and PetroCorp announced that: (a) the date of their merger was rescheduled from May 30 until June 6, 2001; and (b) the final date for receipt of Stock Election Forms was moved from May 29 until June 5, 2001 at 5 p.m.

39. The merger consideration furnished by PetroCorp to Southern Mineral's stockholders was: (a) $4.71 in cash per share; and (b) .471 shares of PetroCorp stock per share, subject to proration in the event that Southern Mineral's shareholders elected to receive more than 4 million shares of PetroCorp stock. (PX15 at pp. 1–2, 5, 58–59, I–3, I–5, VIII–1–VIII–3 (Opinion of Southern Mineral's financial advisor); PX31; Tr. at 126–29 (Christopher); Tr. at 308 (Buck); Tr. at 575 (Mikel).) [5]

*Pre–Merger Negotiations*

40. Southern Mineral and PetroCorp began merger discussions shortly after Southern Mineral emerged from bankruptcy protection. (Tr. at 140–41 (Christopher); PX6, PX7.) Steve Amos, PetroCorp's Controller, brought the Warrants to Mr. Christopher's attention, perhaps for the first time, in an e-mail Mr. Amos sent

---

5. In the event that a Southern Mineral stockholder elected to convert only a portion of its shares into stock, the merger consideration consisted of a combination of cash and PetroCorp stock. (PX31 at p. 2.)

to Mr. Christopher on November 13, 2000. (PX8; Tr. at 139–140 (Christopher).)

41. By November 24, 2000 letter to Randy King, an employee of Petrie Parkman & Co., Southern Mineral's financial advisor, Mr. Christopher made the following proposal concerning the structure of the merger:

(1) **Purchase of SMC Common Stock.** PetroCorp will acquire all of the SMC Common Stock and Warrants to purchase SMC Common Stock in a tripartite statutory merger of SMC and a wholly-owned subsidiary of PetroCorp ("PetroCorp Sub") in which, as of the Closing, all issued and outstanding shares of SMC Common Stock and Warrants as of the date of Closing, will be converted into the right to receive at Closing an aggregate of (a) $18,254,099 … and (b) 4,000,000 shares of Petro-Corp Common Stock. . . . After all estimated adjustments, this equates to $2.01 and 0.25 share of PetroCorp Common Stock per share of fully diluted SMC Common Stock. . . .

(2) **Mechanics of Merger.** The mechanics for accomplishing the Merger are as follows: . . .

(b) As a condition of the Merger, not less then eighty-five percent (85%) of the Warrants shall have been duly exercised and the exercise price thereof received by SMC immediately prior to the Merger.

(c) The aggregate Merger Consideration will be issued (or, in the case of Warrants, reserved for issuance upon exercise of the Warrants) proportionately in respect of the total of all shares of SMC Common Stock and Warrants to acquire SMC Common Stock outstanding as of the Closing. Each Warrant will be entitled to receive its proportionate part of the 4,000,000 PetroCorp shares when the Warrant is exercised and payment of the exercise price is received by SMC.

(PX9 at p. 1.)

42. Mr. Christopher explained that PetroCorp required that eighty-five (85%) percent of Southern Mineral's Warrants be exercised as a condition of the merger because "PetroCorp did not want to assume the overhang of the Southern Mineral warrants … [PetroCorp was] willing to … take on a few of them, but not very many." (Tr. at 143 (Christopher); *see also* Tr. at 145–47 (Christopher).)

43. Mr. Christopher further testified that PetroCorp was willing to take on only a few Warrants because: (a) PetroCorp "desired to keep [its] balance sheet clean, as we continued to grow the company, to make [PetroCorp] an attractive candidate for someone else to acquire;" and (b) it was not possible to put a value on the Warrants' perpetual option to exercise. (Tr. at 143–45 (Christopher).) PetroCorp wanted the vast majority of Warrants to be exercised in the merger because otherwise PetroCorp "would have had a class of security … going forward …—depending on what the future conditions were—[and] would not know what kind of liability it would be to the existing shareholders, and that was not acceptable to PetroCorp." (Tr. at 145 (Christopher).)

44. By letter to Mr. Christopher dated November 27, 2000, (PX10), Mr. Mikel responded to Mr. Christopher's November 24 proposal. In this letter, Mr. Mikel stated:

*The second major issue of concern is the condition that 85% of the Perpetual Warrants be exercised prior to closing. Without arguing the merits of the assumption of the Warrants, it is a significant condition that troubles us. The Warrants are a contractual responsibility of SMC [Southern Mineral] that*

*cannot be abrogated. We feel that the condition should be eliminated or reduced to a meaningful level of 50%, and that PEX [PetroCorp] should agree to assume the remaining Warrants;* they will represent less than 7% of pro forma PEX's equity securities on a fully diluted basis if none were exercised. Based upon a 50% exercise, outstanding Warrants would represent less than 5% of PEX's pro forma equity securities.

We offer the following guidance with respect to your consideration of a new proposal to SMC. Cash consideration of $2.25 plus .25 PEX shares for each share of SMC common stock, not subject to adjustment, is a proposal that will receive SMC Board attention this week. *A new proposal should indicate that PEX is prepared to reduce or eliminate the condition relating to the Warrants and assume all unexercised Perpetual Warrants.* Should you decide to move forward on this structure, we feel that the remaining details of a mutually satisfactory undertaking could be completed in one or two days.

(PX10 at pp. 1–2 (emphasis added).)

45. With respect to Mr. Mikel's November 27 letter, Mr. Christopher understood that Southern Mineral's position was that the remaining fifty (50%) percent of the Warrants would be exercisable into PetroCorp stock for an indefinite period of time after the merger. (Tr. at 149–50 (Christopher).) Mr. Christopher understood that Mr. Mikel was saying that the unexercised Warrants: (a) were the contractual obligation of Southern Mineral which could not be abrogated; and (b) had to remain outstanding and exercisable into PetroCorp stock. (Tr. at 150–51 (Christopher).) However, for PetroCorp, assumption of the Warrants was an issue that could be a "deal breaker." (Tr. at 151–52 (Christopher); Tr. at 104 (Luttrell).)

46. Because PetroCorp would not assume the Warrants—even though PetroCorp was offering its stock as a portion of the merger consideration—PetroCorp's management devised a proposed merger structure to ensure that there would be no Warrants exercisable into PetroCorp stock following the merger. (PX11 ¶ 5(a)(iii); Tr. at 153 (Christopher).) This merger structure was set forth in PetroCorp's December 6, 2000 letter of intent (the "LOI"). (PX11.) Southern Mineral agreed to the LOI on December 8, 2000. (PX11.) The structure set forth in the LOI formed the basis for the structure in the Merger Agreement. (*Compare* PX11 at pp. 1–3 *with* PX15 at pp. 1–2, 4–5, 102, I–3, I–5.)

47. The LOI contained a representation by Southern Mineral that the Warrants to acquire Southern Mineral stock would not be outstanding as of the merger's closing. (PX11 ¶ 5(a)(iii); Tr. at 153–54 (Christopher).)

48. Michael Luttrell, the former Vice President and Chief Financial Officer of Southern Mineral, who testified at trial by deposition without objection, confirmed that the merger was structured so that the Warrants would not remain exercisable into PetroCorp stock after the merger. (Tr. at 84–86 (Luttrell), 102–03 (Luttrell).) Mr. Luttrell testified as follows:

Q. What were the issues, if any, with respect to Southern Minerals' warrants that had to be resolved?

A. Well, one of PetroCorp's concerns was that those warrants didn't continue to be perpetual as a PetroCorp warrant. I mean, in other words, convert from a Southern Mineral to a Petrocorp.

Q. Who expressed that concern to you?

A. The PetroCorp people.

Q. Specifically?

A. Well, I mean I am sure Gary Christopher primarily.

Q. Did Mr. Christopher give you an explanation for his concern?

A. I think it was really more the overhang, the evolution, you know, possibly that would be hanging out there.

. . .

Q. . . . Did anyone on behalf of Southern Mineral respond to Mr. Christopher's concern concerning not wanting the perpetual warrants to be perpetual PetroCorp warrants?

A. Yes.

. . .

Q. Leaving aside the specifics of who said what, do you remember what was said to Mr. Christopher with respect to the perpetual warrants?

[Objection omitted]

A. I think it was a legal issue, you know, how to deal with achieving his objectives.

Q. What were his objectives?

A. For those warrants not to continue to be perpetual in the scheme of PetroCorp's capital structure in the future.

(Tr. at 85–86 (Luttrell); *see also* Tr. at 102–04 (Luttrell).)

49. Mr. Luttrell's testimony confirms that PetroCorp refused to assume the Warrants and structured the merger so that the Warrants would not be outstanding thereafter. Southern Mineral was anxious to complete the merger and did not want issues concerning the Warrants to prevent completion of the proposed merger. (Tr. at 104 (Luttrell).) It is plain that Southern Mineral's management was aware of the perpetual nature of the Warrants and attempted not to have the contractual obligations abrogated in the merger, but, when PetroCorp refused to have the Warrants outstanding after the merger, Southern Mineral simply succumbed in order to get the merger done.

50. On December 8, 2000, Mr. Christopher sent an e-mail reflecting upon the problem caused by the Warrants during the merger negotiations. (PX12.) Mr. Christopher stated that:

> On a fully diluted basis, total consideration to the SMIN [Southern Mineral] shareholders is $79.4MM, plus an estimated $2.8MM of merger costs, in a combination of cash and stock, again with the PEX stock valued at $10/share. Based on the election of their shareholders/warrant holders, we could issue as few as 3MM or as many as 4MM shares of PEX common stock with the balance paid in cash or in cash reserved for non responding warrant holders. *The real problem we encountered was the fact their 3.7MM warrants are perpetual and we refused to do a transaction that could leave a block of current SMIN warrant holders with a perpetual below value and probable below market option on PEX shares,* Any warrant holder that does not exercise their right prior to closing is only entitled to $.50 in cash and this nonexercise only enhances our purchase price. Their warrant holders have the right to acquire one share of SMIN common stock for $4.21. Our proposal has the economic value of $4.71/share.

(PX12 at p. 1 (emphasis added).)

51. Mr. Christopher's December 8, 2001 e-mail demonstrates that PetroCorp insisted on a merger structure that ensured that the Warrants would not remain outstanding and be convertible into PetroCorp stock after the merger.

*The Warrants' Trading History*

52. The Warrants began trading on the Bulletin Board as of October 16, 2000 and were delisted form the Bulletin Board on

June 7, 2001, one day after the merger was consummated. (*Mackie I*, 244 F.Supp.2d at 282; PX115 at pp. 38–44.)

53. Between October 16 and December 21, 2000, the Warrants traded in a range between $.4063 and $.9063. (PX77 at p. 1.) The high was reached on November 7, 2000; the low was reached on November 29, 2000. (*Id.*) The average daily closing price for the Warrants during this period was $.6473. (*Id.*) The average daily trading volume was 15,885 Warrants. (*Id.*)

54. On December 21, 2000, the day before the planned merger between Southern Mineral and PetroCorp was announced, the closing price for the Warrants on the Bulletin Board was $.5625. (PX77.)

55. On December 22, 2000, Southern Mineral and PetroCorp announced their planned merger. (*Mackie I*, 244 F.Supp.2d at 282.) Between December 22, 2000, and June 7, 2001, the Warrants traded in a range between $.49 and $.5938. (Tr. at 354 (Morris); PX115 at pp. 38–40; PX64 at pp. 1–4.) From May 2 until June 5, 2001, the closing price for the Warrants ranged from a high of $.56 on May 2 to a low of $.49 on June 5, 2000. (PX115 at p. 38; PX64 at p. 1.) The Warrants did not trade on June 6, 2001 and closed at $.4920 on June 7, 2001 on volume of 4,300 Warrants. (PX115 at p. 38; PX64 at p. 1.)

*Trading History of Southern Mineral's Stock from October 13, 2000 Through June 7, 2001*

56. After Southern Mineral's emergence from bankruptcy protection, its common stock was quoted and traded on the Bulletin Board under the symbol "SMOP.OB." (PX55 at pp. 12–13 (Item 5. Market for Common Equity and Related Stockholder Matters); PX15 at p. 9–10.) Southern Mineral's common stock stopped trading on the Bulletin Board on June 7, 2001, one day after the Southern Mineral-

PetroCorp merger was consummated. (PX78 at p. 1; PX15 at pp. 1, I–3.)

57. Between October 13 and December 21, 2000 Southern Mineral's stock traded in a range between $2.90 and $3.50. The high was reached on October 13, 2000; the low was reached on November 30, 2000. (PX76 at p. 1) The average daily closing price for the stock during this period was $3.2045. (*Id.*) The average daily trading volume for the stock was 74,392 shares. (*Id.*)

58. On December 21, 2000, the closing price for Southern Mineral's stock on the Bulletin Board was $3.125. (PX76.)

59. On December 22, 2000, the date that the planned merger was announced, Southern Mineral's stock closed at $4.00. (PX78 at p. 3.) With the exception of eight days in late December 2000 and early January 2001, Southern Mineral's stock did not close below $4.00 again. (PX78 at pp. 1–3.) From January 9 through June 7, 2001, Southern Mineral's stock traded in a range of $4.07 and $4.74. (PX78 at pp. 1–3.) During this period, the high was reached on May 23, 2001; the low was reached on March 1, 2001. (PX78 at p. 2.) From May 18, 2001 through June 1, 2001, the stock traded at or above $4.71, the value of the stock and cash consideration offered to Southern Mineral's shareholders. (PX78 at p. 1.)

60. On June 7, 2001, the last day that Southern Mineral's stock was traded on the Bulletin Board, the stock closed at $4.67 on volume of 16,300 shares. (PX78 at p. 1.)

*The Plaintiffs' Purchases and Sales of Southern Mineral Warrants*

61. RAMLP is a NASD broker-dealer which specializes is trading in warrants. (Tr. at 377 (Bridges).) RAMLP made markets in NASDAQ securities and Bulletin Board-type securities and looked for

warrant situations that it found attractive to trade. (Tr. at 377 (Bridges); Tr. at 610–12 (Mackie).)

62. RAMLP determined to purchase Warrants because, among other things: (a) the terms of the Warrants were attractive; (b) the trading price of the Warrants was artificially depressed as a result of the announced terms of the merger; (c) RAMLP believed that the terms of the merger violated the Warrant Agreement; and (d) RAMLP hoped to persuade Southern Mineral and PetroCorp to abide by the Warrant Agreement. (Tr. at 394–96 (Bridges), 449 (Bridges), 470–71 (Bridges), 493–95 (Bridges); Tr. at 636–38 (Mackie), 669–70 (Mackie), 718–23 (Mackie).)

63. RAMLP began purchasing Warrants on January 3, 2001 and was a market maker for the Warrants. (PX66 at p. 1; Tr. at 612 (Mackie).) RAMLP's last net purchase of Warrants was on June 7, 2001. (PX66 at p. 16; Tr. at 412–13 (Bridges).) On that date, RAMLP bought 3,270 Warrants at $.4920 for a total purchase price of $1,608.84. (PX66 at p. 16; Tr. at 411 (Bridges).) From January 3, 2001 through June 5, 2001, RAMLP purchased a net total of 403,339 Warrants. (PX66 at pp. 2–15; Tr. at 419 (Bridges).) RAMLP purchased the Warrants from other market makers in that security; RAMLP did not purchase any Warrants from retail customers or from Southern Mineral directly. (Tr. at 407–08, 413 (Bridges).)[6]

64. Prior to June 6, 2001, RAMLP sold warrants to three different groups that had an interest in buying the Warrants: WSC, Millenco, L.P. ("Millenco") and Allen & Company ("Allen"). (Tr. at 414 (Bridges).) WSC and Allen were market makers and securities broker-dealers; Millenco was neither a market maker nor a

broker-dealer. (Tr. at 414 (Bridges), 423–424 (Bridges); Tr. at 507 (Rose).) Accordingly, RAMLP sold Warrants to Millenco through an account that Millenco maintained with Allen. (Tr. at 417 (Bridges), 490 (Bridges).)

65. On September 25, 2001, RAMLP sold 200,000 Warrants to Allen for the account of Millenco at a price of $.50 per Warrant. (PX66 at p. 16; Tr. at 412 (Bridges).) On the same date, RAMLP also sold 200,000 Warrants to Mr. Mackie's account at a price of $.50 per Warrant. (PX66 at p. 16; Tr. at 412 (Bridges).) RAMLP's September 25 sales were made to improve RAMLP's balance sheet as of that date. (Tr. at 412 (Bridges), 415–16 (Bridges).)

66. On December 14, 2001, RAMLP purchased 55,000 Warrants from Mr. Mackie's account at a price of $.50 per Warrant. (PX66 at p. 16; Tr. at 412 (Bridges).) On December 27, 2001, RAMLP purchased 145,000 Warrants from Mr. Mackie's account at a price of $.50 per Warrant. (PX66 at p. 16; Tr. at 412 (Bridges).)

67. On December 18 and 28, 2001, RAMLP tendered a total of 206,609 Warrants for redemption to PetroCorp's transfer agent at the $.50 redemption price. (PX66 at p. 17; Tr. at 409–10 (Bridges), 420 (Bridges).) RAMLP tendered its Warrants for redemption to mitigate damages. (Tr. at 752 (Mackie).) RAMLP received $103,304.50 from the redemption of its Warrants. (PX82 at p. 4.)

68. Since 1991, RAMLP has had the ability to make recommendations to purchase and sell securities in Millenco's account. (Tr. at 629 (Mackie); Tr. at 414–16

---

6. RAMLP is a wholesaler of securities and does not have any retail accounts. (Tr. at 408 (Bridges); Tr. at 606 (Mackie).) All of RAMLP's securities accounts are proprietary. (Tr. at 413 (Bridges).)

(Bridges), 423–24 (Bridges), 490 (Bridges), 495 (Bridges); PX67.) As a matter of practice, an RAMLP employee would telephone Millenco with a recommendation to purchase or sell securities in the account and Millenco would routinely follow RAMLP's recommendations. (Tr. at 415 (Bridges); Tr. at 629 (Mackie).)

69. RAMLP has a financial interest in Millenco's account amounting to forty (40%) percent of the net profits therein. (Tr. at 629 (Mackie); Tr. at 416 (Bridges).) This is the only account maintained by Millenco to which RAMLP sold Warrants and all of the trades in that account, (PX67), were recommended by RAMLP. (Tr. at 416 (Bridges), 427 (Bridges), 431–32 (Bridges); Tr. at 715 (Mackie).) RAMLP recommended that Millenco purchase Warrants for the same reasons that it purchased Warrants for its own account. (Tr. at 636–37 (Mackie).) [7]

70. Millenco began purchasing Warrants—based on RAMLP's recommendations—on January 5, 2001. (PX67 at p. 1.) In accordance with RAMLP's recommendations, between January 5 and June 4, 2001 Millenco bought 344,000 Warrants. (PX67 at p. 1; Tr. at 452–53 (Bridges).)

71. At the recommendation of RAMLP, Millenco purchased 360,500 Warrants (at a price of $.50 per Warrant) from Allen on July 12, 2001. (PX67 at p. 1.) Allen sold these Warrants because its trader who purchased the Warrants, who is Mr. Mackie's son, was retiring and did not believe that it was proper to leave the position open at Allen when he was not there to supervise it. (Tr. at 428–29 (Bridges).) The Warrants which Allen sold to Millenco were purchased (by Allen) before the merger. (Tr. at 454 (Bridges).)

72. As set forth above, on September 25, 2001, RAMLP sold 200,000 Warrants to Millenco. (PX67 at p. 1; Tr. at 430, 453–54 (Bridges).) Allen acted as Millenco's broker in this transaction and charged Millenco's account with a $.01 mark-up to cover expenses in connection with this transaction. (PX67 p. 1; Tr. at 430 (Bridges).)

73. Millenco purchased a total of 904,500 Warrants. (PX67 at p. 33; Tr. at 430 (Bridges).) At RAMLP's instruction, Millenco tendered these Warrants for redemption on January 3, 2002. (Tr. at 430–32 (Bridges), PX67 at p. 33.) Millenco received $452,250 from the redemption of the Warrants. (PX82 at p. 3.)

74. Stephen Rose, Manager of WSC's Arbitrage Department, learned about the Warrants from a press release sent to him by Bruce Bridges. (Tr. at 501–02 (Rose).) Mr. Rose read the press release when he received it and compared it to the Warrant Agreement. (Tr. at 502 (Rose).) This comparison established to Mr. Rose's satisfaction that the terms of the proposed merger breached the Warrant Agreement. (Tr. at 502–03 (Rose).)

75. Between January 16 and June 5, 2001, WSC purchased a net total of 200,772 Warrants. (PX68 at p. 1; Tr. at 508 (Rose).) WSC bought 171,801 of these Warrants from RAMLP. (PX68 at p. 1.) WSC purchased these Warrants in arms'-length transactions. WSC purchased the Warrants because Mr. Rose, based on his evaluation of the Warrant Agreement, thought: (a) the Warrants were well underpriced; and (b) the terms of the merger should be changed to comply with the Warrant Agreement. (Tr. at 511 (Rose).)

---

7. Millenco assigned its claims against the defendants to RAMLP in or about late March or early April 2002. (PX102; Tr. at 422–26 (Bridges), 431–32 (Bridges), 495 (Bridges).) RAMLP granted to Millenco an interest in any recovery in proportion to the losses suffered by Millenco compared to the aggregate loss for which RAMLP obtains recovery. (PX102.)

Mr. Rose, who has been trading warrants for 23 years, (Tr. at 499–500 (Rose)), believed the Warrants were underpriced because they had a long time to run, were not callable, and were more than a viable trading option had they remained exercisable into the stock component of the merger consideration as required by the Warrant Agreement. (Tr. at 511 (Rose).) [8]

76. WSC tendered its Warrants for redemption at the $.50 redemption price on December 24, 2001. (PX68 at p. 2; Tr. at 515 (Rose).) WSC tendered the Warrants for redemption to free up its capital for other purposes. (Tr. at 515 (Rose).)

### The Plaintiffs' Contacts with Southern Mineral and PetroCorp

77. Before completion of the merger, Mr. Bridges spoke with and wrote to Southern Mineral's attorneys at Akin Gump protesting the treatment of the Warrants in the planned merger. (PX96, PX97; Tr. at 432–37 (Bridges).) Mr. Bridges also spoke with and wrote to several of PetroCorp's officers protesting the treatment of the Warrants. (PX98; Tr. at 436–37 (Bridges).) Even after the merger, RAMLP's attorneys wrote to PetroCorp seeking to change the treatment of the Warrants. (PX100; Tr. at 449–51 (Bridges).) All of these efforts were unsuccessful. (PX101; Tr. at 432–37 (Bridges), 449–51 (Bridges).)

78. By letter to Southern Mineral's Board of Directors, dated April 5, 2001, Mr. Mikel enclosed four letters from Warrant holders complaining about the treatment of the Warrants in the merger. (PX38.) In his letter, Mr. Mikel stated "PetroCorp indicates that they are disinclined to do anything to change the transaction structure at this time. We are unable to change the structure of our

transaction with PetroCorp without their permission." (PX38 at p. 1.)

### The Trading Price of the Warrants Was Artificially Depressed After Announcement of the Merger

79. The plaintiffs called Mr. Mackie to testify as an expert concerning the market for warrants and as to the value of the Warrants. As set forth below, the Court found that Mr. Mackie was qualified as an expert on these subjects and permitted him to testify as an expert. (Tr. at 673 (Court).)

80. Mr. Mackie has been trading and valuing warrants since 1968. (Tr. at 600 (Mackie).) Mr. Mackie seeks to trade undervalued warrants and has endeavored to locate and evaluate the value of every warrant traded on a public market in the United States over the past 25 years. (Tr. at 610–12 (Mackie).) Mr. Mackie believes that he has examined between 500 and one thousand warrant issues to determine whether such warrants were undervalued. (Tr. at 610 (Mackie).) RAMLP has made a market in at least 300 warrants since Mr. Mackie started the firm in the late 1980's. (Tr. at 603–05 (Mackie), 631 (Mackie).)

81. In late 2000 or early 2001, Mr. Mackie reviewed the trading history of Southern Mineral's stock and Warrants to determine how the Warrants traded in relationship to the stock. This enabled Mr. Mackie to determine how the Warrants would trade in the event that the constraints of publically announced terms of the merger were removed. (Tr. at 638 [Mackie]; PX76; PX77.)

82. Mr. Mackie testified that from October 16 through December 21, 2000, the Warrants' trading range and average daily volume was what he expected from a firm that recently emerged from bankruptcy.

---

**8.** WSC made a market in the Warrants. (Tr. at 512 (Rose).) WSC did not buy any War-

rants after the date of the merger. (Tr. at 514 (Rose).)

(Tr. at 640–41 (Mackie).) Mr. Mackie explained that the trading range for the Warrants ($.9063—$.4063) was expected because: (a) the Warrants traded on the OTC Bulletin Board; (b) there is very little publicity about the Bulletin Board market (*e.g.,* quotes for the Bulletin Board are not published in widely circulated newspapers); and (c) there were restrictions on securities broker-dealers that wanted to trade Bulletin Board securities on behalf of public customers. (Tr. at 640–41 (Mackie); *see also* Tr. at 396–97 (Bridges).)

83. Mr. Mackie testified that the average daily trading volume for the Warrants (15,885) was not significant given the Warrants' average daily closing price of $.6473 in the period before the merger was announced. (Tr. at 641 (Mackie); PX77 at p. 1; *see also* Tr. at 397–98 (Bridges).)

84. The trading range for Southern Mineral's stock before the merger announcement ($3.50—$2.90) was also predictable for a Bulletin Board security when the issuer had recently emerged from bankruptcy. (Tr. at 641–42 (Mackie); PX76 at p. 1.)

85. Once the merger was announced, the Warrants traded in a range between $.5938 and $.49. (PX64 at pp. 1–3.) As the merger closing date drew nearer, the Warrants consistently traded below $.53, before descending to $.49 on the day before the merger. (PX64 at p. 1.) Mr. Mackie testified credibly that the Warrants remained in a narrow trading range around the $.50 redemption price because their "value was capped by the terms of the merger. The most you could get for the [W]arrants, if you did not want to exercise into the common stock, was 50 cents. So why would anybody pay more unless the terms of the warrants were going to be modified, as they should have been. . . ." (Tr. at 674 (Mackie).) Similar-ly, Mr. Mackie testified that Warrants would have traded at substantially higher prices in tandem with Southern Mineral's stock if the Warrants had remained exercisable into the merger consideration, including PetroCorp stock. (Tr. at 669–71 (Mackie), 723 (Mackie).)

86. Mr. Mackie based his opinion concerning the merger announcement's effect on the Warrants' trading price on: (a) his years of experience in valuing warrants; (b) calculations from the Black–Scholes pricing model and his own proprietary models; and (c) the subsequent trading history of PetroCorp's stock. (Tr. at 670–71 (Mackie).) Mr. Mackie has used the Black–Scholes model to value Warrants for approximately 19 years. (Tr. at 671 (Mackie).)

87. Mr. Mackie's opinion with respect to the merger announcement's effect on the Warrants' trading price is confirmed by the testimony of Gregory Morris ("Morris"), an accountant and senior manager employed by Ernst & Young LLP ("E & Y"). The defendants retained E & Y to research and draft a Valuation Analysis of the Warrants (the "Valuation Analysis") in connection with this litigation. (PX115.) The defendants, however, did not call Mr. Morris, or any other partner or employee of E & Y, as an expert witness at trial. Portions of Mr. Morris' deposition testimony were read into evidence at trial.

88. Mr. Morris testified that the Warrants traded in an approximate range of between $.50—$.60 after the merger announcement because "at some point between the announcement and the close[,] . . . the transaction consideration was announced, [and] . . . it's natural to expect that the trading price of these [W]arrants would close in on what ultimately would be received by the [W]arrant holders when the transaction is closed." (Tr. at 354 (Morris).)

89. E & Y's Valuation Analysis and Mr. Morris' testimony also support Mr. Mackie's conclusion that the Warrants' trading price would have moved higher after the merger announcement had the Warrants remained exercisable into the merger consideration, including PetroCorp stock. In its Valuation Analysis, E & Y states that "Warrants are traded as securities whose price reflects the value of the underlying stock." (PX115 at p. 16.) According to the Valuation Analysis, the trading price of the Warrants should have moved higher along with the price of Southern Mineral's stock upon announcement of the merger.

90. Mr. Morris was not able to explain or reconcile the actual trading history of the Warrants subsequent to the announcement with the: (a) undisputed statement in the Valuation Analysis that warrants are securities whose price reflects the underlying stock; and (b) the rise of Southern Mineral's stock price after the announcement. (PX78; Tr. at 367–69 (Morris).) Mr. Morris' failure to reconcile the Valuation Analysis and his testimony with the actual trading in Southern Mineral's stock and Warrants after the merger announcement leads the Court to conclude that E & Y's valuation of the Warrants on June 6, 2001 ($.50) is not correct.

91. Based on Mr. Mackie's testimony, the Court finds that the trading price of the Warrants on and after the public announcement of the planned merger, December 22, 2000, was depressed by the news that: (a) to receive PetroCorp stock in the merger, Warrant holders were required to exercise their Warrants and elect to receive stock before the expiration of the merger election period; or (b) those Warrant holders that failed to do so would receive only the redemption price of $.50 per Warrant.

*Fair Value of the Warrants on June 6, 2001*

92. Mr. Mackie drafted two reports addressing the value of the Warrants as of June 6, 2001. (PX89, PX91.) The first report, dated October 15, 2002 (the "Report"), calculates the fair value of the Warrants using the Black–Scholes pricing model and does not take into account the proration of PetroCorp stock which occurred in the merger. (PX89; Tr. at 680 (Mackie).) The second report, prepared March 5, 2003 (the "Supplemental Report"), also used the Black–Scholes model to calculate the fair value of the Warrants, but took proration into account. (PX91; Tr. at 691 (Mackie).) Mr. Mackie ran a Black–Scholes valuation model available on the Bloomberg Professional Service. (PX89 at p. 3, Ex. B; PX91 at Ex. B.)

93. Mr. Mackie testified that he used the Black–Scholes model to value the Warrants because: (a) the trading price of the Warrants had been artificially capped after announcement of the merger; and (b) the Warrants did not survive the merger to become PetroCorp warrants convertible into all of the merger consideration, including PetroCorp stock. (Tr. at 685 (Mackie); PX89 at pp. 6–7.) Mr. Mackie testified credibly that: (c) Black–Scholes was the best independent means to value warrants in such circumstances; and that: (d) the values generated by this model were consistent with (i) his own perception of the Warrants' value based on his experience and (ii) the Warrant values generated by his own proprietary models. (Tr. at 685–87 (Mackie).) Mr. Mackie explained that if the trading price had not been depressed due to the publicly announced terms of the merger, the Warrants would have traded at approximately half the price of Southern Mineral's stock. (Tr. at 686–87 (Mackie).)

94. Mr. Mackie testified that Black–Scholes was a valuable tool to determine the value of the Warrants, and RAMLP used the model to evaluate every warrant that it had an interest in purchasing. (Tr. at 671–72 (Mackie).) Mr. Mackie explained that Black–Scholes had been subject to favorable testing and commentary, that traders of derivative securities used Black–Scholes on a regular basis and that Black–Scholes is used by 28 of the 30 corporations comprising the Dow Jones Industrial Average. (Tr. at 672 (Mackie).)

95. E & Y also used the Black–Scholes model available on Bloomberg Professional Service in reviewing Mr. Mackie's conclusions. (Tr. at 352–53 (Morris).) Mr. Morris confirmed that Black–Scholes is "an accepted model in practice" to value warrants. (Tr. at 349 (Morris).) Using the assumptions employed by Mr. Mackie, E & Y was able to confirm his conclusions concerning the value of the Warrants. (Tr. at 352–53 (Morris); PX115 at p. 44.)

96. Mr. Mackie opined that the fair price of the Warrants was $2.32 on June 6, 2001 without taking any proration into account. (Tr. at 676–81 (Mackie), 685 (Mackie); PX89 at pp. 7–9, Ex. B.) The fair value of $2.32 is based on the assumption that the Warrants remained convertible into all of the merger consideration, including PetroCorp stock, after consummation of the merger. (Tr. at 676–677 (Mackie); PX89 at pp. 7–9.)

97. Mr. Mackie's opinion that the Warrants had a fair value of $2 .32 is based on the five elements taken into account by Black Scholes: price of the underlying common stock; the strike price of the warrant; remaining duration of the warrant; interest rate (in this case, the United States Treasury Note 10 year interest rate), and the volatility of the underling stock. (Tr. at 651 (Mackie), 677 (Mackie); PX89 at pp. 7–9, Exs. B and C thereto.)

98. Mr. Mackie did not factor proration into his first model because certain Southern Mineral shareholders and their affiliated corporations executed agreements enabling them to avoid proration of the PetroCorp stock. (Tr. at 680 (Mackie); PX15 at V–1–V–6, VI–I–VI–6.)

99. Mr. Mackie admitted that those shareholders who avoided proration signed agreements with PetroCorp that had additional value for PetroCorp because the agreements required the shareholders to tender all of their shares. (Tr. at 680–81 (Mackie).) Mr. Mackie also conceded that there was nothing in the Warrant Agreement that required PetroCorp to give warrant holders the option of signing such an agreement to tender all of their shares and avoid proration. (Tr. at 681 (Mackie).)

100. Mr. Mackie therefore used the Black–Scholes model to give an opinion as to the fair value of the Warrants on June 6, 2001, taking into account: (a) the proration that actually occurred in the merger; and (b) the number of Warrants bought by the plaintiffs and Millenco before and after the merger. (PX91; Tr. at 682–83 (Mackie); PX21.) Mr. Mackie opined credibly that the fair value of the Warrants on a fully prorated basis was $1.96. (Tr. at 683 (Mackie); PX91 at pp. 4–7 and Ex. B thereto.) The $1.96 fair value is consistent with Mr. Mackie's experience and the value generated by his own proprietary models. (Tr. at 685 (Mackie).)

101. A component of the Black–Scholes model, and an important consideration in Mr. Mackie's valuation opinions, is the time value of the Warrants, i.e., duration. (Tr. at 635 (Mackie), 659–660 (Mackie), 711–13 (Mackie).) Time value incorporates not only the literal passage of minutes, hours and days, but also the "expectation that something good will happen to the option." (Tr. at 659–60 (Mackie), 635

(Mackie), 711–14 (Mackie); *see also* Tr. at 281 (Buck) ("there is a value to the exercisablility or optionality of the [W]arrant"); Tr. at 483 (Bridges) ("[d]uration affects price").)

102. The effect of the Merger Agreement was to require the Warrant holders, before the effective date of the merger, to convert the Warrants into Southern Mineral stock to be able to convert that stock into the merger consideration including PetroCorp stock. If the Warrant holders did not convert the Warrants, they would be left with Warrants which forever would be exercisable only to obtain $.50 per Warrant. The perpetual feature of the Warrants was thus breached by the Merger Agreement and the time value of the Warrants was taken away. (Tr. at 712 (Mackie).)

### Damages

103. Mr. Mackie testified concerning the plaintiffs' damages using the prorated and non-prorated fair value of the Warrants. (Tr. at 696–704 (Mackie); PX82, PX86.) These damages calculations encompassed all of the Warrants bought by RAMLP, WSC and Millenco before and after the merger and took into account the sum that each received from redemption of their Warrants. (Tr. at 696–704 (Mackie); PX82, PX86.) Mr. Mackie calculated damages as of June 6, 2001. (Tr. at 697 (Mackie).)

104. The calculations to establish the plaintiffs' damages, on a fully prorated basis, are as follows:

### RAMLP

(1) 206,609 (warrants) × $1.96 (fully prorated fair value) = $404,953.64

(2) 206,609 (warrants) × $.50 (redemption price) = $103,304.50

(3) $404,953.64 (fully prorated fair value)—$103,304.50 (redemption price received) = $301,649.14 (damages)

### RAMLP (as assignee of Millenco)

(4) 904,500 (warrants) × $1.96 (fully prorated fair value) = $1,772,820.00

(5) 904,500 (warrants) × $.50 (redemption price) = $452,250.00

(6) $1,772,820.00 (fully prorated fair value)—$452,250.00 (redemption price received) = $1,320,570.00 (damages)

### WSC

(7) 200,772 (warrants) × $1.96 (fair value) = $393,513.12

(8) 200,772 (warrants) × $.50 (redemption price) = $100,386.00

(9) $393,513.12 (fully prorated fair value)—$100,386.00 (redemption price received) = $293,127.12 (damages)

### Total

(10) $301,649.14 (RAMLP/damages) + $1,320,570.00

(RAMLP–Assignee/damages) + $293,127.12 (WSC/damages) = **$1,915,346.26** (total damages/fully prorated)

(PX82.)

## CONCLUSIONS OF LAW

### Jurisdiction and Governing Law

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because of the complete diversity of citizenship between the plaintiffs and the defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Pursuant to its express terms, the Warrant Agreement is governed by the laws of the State of Texas. (PX1 § 6.12; *see also Mackie I*, 244 F.Supp.2d at 283.)

### Breach of Contract

3. "Under Texas law, the elements of a breach of contract claim are: (1) the existence of a contract between the plaintiff and the defendant; (2) the creation of

duties under the contract; (3) a breach of a duty by defendant; and (4) damages sustained by the plaintiff as a result of the breach." *In re Absolute Resource Corp.*, 76 F.Supp.2d 723, 733 (N.D.Tex.1999).

■ 4. As holders of the Warrants and as third-party beneficiaries of the Warrant Agreement, RAMLP, for itself and as assignee of the claims of Millenco, and WSC may sue to enforce the Agreement because "the contract was actually made for [their] benefit and ... the contracting parties intended that [they] benefit by it." *Hellenic Investment, Inc. v. Kroger Co.*, 766 S.W.2d 861, 864 (Tex.App.1989). The Warrant Agreement states that it is made between "Southern Mineral Corporation ... (including its successors and permitted assigns, the "Company") and American Stock Transfer & Trust Company...." (PX1 at p. 1.) Section 6.10 of the Warrant Agreement states that "[a]ll the covenants and provisions of this Agreement by or for the benefit of the Company or the Warrant Agent or the holders of the Warrant Certificates shall bind and inure to the benefit of their respective successors and assigns hereunder." (PX1 § 6.10.) Section 6.13 of the Warrant Agreement also provides that "all covenants, conditions, stipulations, promises, and agreements in this Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and the holders of the Warrant Certificates." The Warrant Agreement is binding on Southern Mineral, PetroCorp, and the plaintiffs, as well as the successors and assigns of each party.[9]

*Contract Interpretation*

5. Under Texas law, when interpreting a contract " 'the primary concern of the court is to ascertain the intentions of the parties as expressed in the instrument.' " *Epps v. NCNB Texas Nat. Bank*, 838 F.Supp. 296, 301 (N.D.Tex.) (*quoting Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)), *aff'd*, 7 F.3d 44 (5th Cir.1993); *Mid–Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 231 (5th Cir.2000). The entire contract is to be examined, so as to give meaning and effect to all of its terms, and not to render any term meaningless. *Epps*, 838 F.Supp. at 301; *Chapman v. Orange Rice Milling Co.*, 747 F.2d 981, 983 (5th Cir.1984). In addition, terms in the contract are to be given "their common, plain, popular, and ordinary meaning, unless it definitely appears that the intention of the parties would thereby be defeated." *Epps*, 838 F.Supp. at 301; *see also Mackie I*, 244 F.Supp.2d at 283.

6. "[W]here an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used." *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 793 (5th Cir.2002) (internal quotation marks omitted). Southern Mineral drafted the Warrant Agreement, and PetroCorp is Southern Mineral's successor-in-interest. *See Duke Energy Field Servs. Assets, Inc. v. Nat'l Union Fire Ins. Co.*, 68 S.W.3d 848, 851 (Tex.App.2002) ("When one business entity is acquired in its entirety by another, ... both the liabilities and the assets of the acquired company are transferred to the purchaser.... A successor corporation is typically invested with the rights and assumes the burdens of the predecessor corporation.").

■ 7. Under Texas law, "[t]he plain and ordinary meaning of ambiguous lan-

---

9. The defendants have not disputed in their Proposed Findings of Fact and Conclusions of Law that RAMLP can sue as a valid assignee of the claims of Millenco, which was an undisputed Warrant holder. *See, e.g., Lindsay ex rel. Lindsay v. S. San Antonio Indep. School Dist.*, 983 S.W.2d 778, 780 (Tex.App.1998) ("At common law, a cause of action for breach of contract is assignable and therefore survives the death of either party.").

guage may be explained by evidence of custom or usage." *Corley v. Entergy Corp.*, 246 F.Supp.2d 565, 574 (E.D.Tex. 2003) (construing an ambiguous easement using rules of contract interpretation under Texas law). "As a general rule, parties are presumed to contract in reference to the usage or custom prevailing in the particular trade or business to which the contract relates, and evidence of custom or usage which tends to explain the intent of the parties regarding an ambiguous contract term, is generally admissible to assist the factfinder in ascertaining the parties' true intent." *Hellenic Investment,* 766 S.W.2d at 866.

8. Texas courts consider the interpretation of the parties to the contract (in this case, Southern Mineral and AST), and other extrinsic evidence to resolve the ambiguities therein. *See United States ex rel. Small Bus. Admin. v. Commercial Tech., Inc.,* 354 F.3d 378, 385 (5th Cir.2003); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). As third-party beneficiaries, RAMLP and WSC have offered extrinsic evidence, including industry custom and usage, to aid in determining the meaning of the contract. *See Hellenic Investment,* 766 S.W.2d at 865–66.

9. The Warrants were convertible securities that were publicly listed and traded on the Bulletin Board. *See Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 197 (2d Cir.2003). In determining the meaning of the Warrant Agreement, the Court will consider the testimony and evidence admitted at trial concerning industry custom and usage in the public securities markets.

*The Plaintiffs' Claims for Breach of Warrant Agreement (Counts I and II)*

10. The plaintiffs assert two claims for breach of the Warrant Agree-

ment. In these claims, the plaintiffs allege that PetroCorp in its own right and as successor-in-interest to Southern Mineral breached the Warrant Agreement by: (a) failing to provide the Warrant holders with the option to exercise their Warrants into any or all of the merger consideration, at a time of the Warrant holders' choosing, after the merger; (b) calling, redeeming and extinguishing the Warrants, and causing the Warrants to expire in the merger; and (c) failing to make lawful and fair provision for the Warrant holders to receive all of the merger consideration for the duration of the Warrants. Any of these alleged breaches would be sufficient to establish the plaintiffs' claim for breach of contract, and the plaintiffs have proved each of them.

11. Under the plain language of Section 3.3 of the Warrant Agreement (PX1 § 3.3), the documents introduced as Exhibits at trial, and the testimony of the witnesses, including (among others) Mr. Christopher, Southern Mineral and PetroCorp were required to allow the Warrant holders to have the opportunity, upon payment of the exercise price, to convert their Warrants—after the merger and at a time of their choosing—into all of the merger consideration offered to Southern Mineral's shareholders. The merger consideration consists of .471 shares of PetroCorp stock (before proration) or $4.71 in cash. Southern Mineral and PetroCorp did not comply with the requirements of the Warrant Agreement and intentionally structured the merger to prevent the Warrant holders from retaining the right to exercise their Warrants into the stock component of the merger consideration after June 5, 2001 at 5 p.m. Southern Mineral and PetroCorp breached the Warrant Agreement by foreclosing the Warrant holders' ability to exercise their War-

rants—which were, under the Agreement, perpetual in duration—at a time of their choosing into the stock portion of the merger consideration.

12. The evidence established that Section 3.3 is a standard provision commonly found in agreements governing warrants, convertible bonds, convertible preferred stock and other convertible securities. The evidence also established that Section 3.3 (and similar provisions found in other instruments) have a uniform meaning in the public securities markets. Section 3.3 gives the Warrant issuer the right to merge with other entities, while, at the same time, requiring the issuer to preserve a Warrant holder's right to exercise its security for the merger consideration, at a time of the Warrant holder's choosing, until the expiration of the Warrant. *See, e.g., Gandal v. Telemundo Group, Inc.*, 23 F.3d 539, 543 (D.C.Cir.1994) (anti-dilution clause gives warrant holders "contractual right to receive same total merger consideration as the shareholders" during the term of the warrant); *Cont'l Airlines Corp. v. Amer. Gen. Corp.*, 575 A.2d 1160, 1165, 1168 (Del.1990) (purpose of anti-dilution clause is "to ensure that the warrants survived the merger without being exercised"); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1352 (Del.1985) (" 'Anti-destruction' clauses generally ensure holders of certain securities of the protection of their right of conversion in the event of a merger by giving them the right to convert their securities into whatever securities are to replace the stock of their company.") (collecting cases). The conclusion that PetroCorp breached the Warrant Agreement is consistent with the market place's understanding of clauses similar to Section 3.3, as well as with the interpretation given to similar provisions by other courts.

13. While PetroCorp argued that Southern Mineral intended that the Warrants would not survive a so-called "liquidating event" or "exit transaction," PetroCorp presented no credible evidence that the Warrant Agreement included any such term. First, the Warrant Agreement expressly addressed the treatment of the Warrants in a merger, reorganization and other related transactions and did not state—or even suggest—that the Warrants would not survive such a transaction. There is simply no provision in the Warrant Agreement that provides that the Warrants, which are explicitly perpetual, can be called or redeemed in the event of a merger or other "liquidating event." Second, the evidence at trial—particularly Mr. Goodgame's August 21, 2000 e-mail, (PX29), and Southern Mineral's attempt to have PetroCorp agree to a merger where outstanding Warrants remained exercisable into PetroCorp stock, (PX24, PX27)—established that the Warrants were intended to survive the merger as rights to exercise into all of the merger consideration, that Southern Mineral was well aware of that fact, and that it agreed to the contrary terms of the Merger Agreement only because it knew that PetroCorp would not agree to honor the perpetual term of the Warrants.

14. As used in Section 3.3, the term "immediately" was not intended to: (a) limit the merger consideration into which a Warrant holder was able to exercise its Warrants; or (b) enable Southern Mineral or its acquiror to place a time limit on a Warrant holder's ability to exercise its Warrants. Instead, "immediately" takes into account the mathematical adjustments made to the exercise feature of the Warrant—*e.g.*, stock dividends, stock splits, and aggregations of Southern Mineral stock—occurring during the Warrants' term prior to a merger. Thus, instead of having the right to purchase shares of

Southern Mineral, a Warrant holder had the right to exercise its Warrants for all of the merger consideration at a time of its choosing—after taking into account prior mathematical adjustments in their exercise feature.

15. The Warrant Certificate is "subject to" the terms and provisions of the Warrant Agreement. (PX2 at p. 1) "The words 'subject to', used in their ordinary sense, mean 'subordinate to', 'subservient to' or 'limited by'. There is nothing in the use of the words 'subject to', in their ordinary use, which would even hint at the creation of affirmative rights." *Fazekas v. Univ. of Houston*, 565 S.W.2d 299, 307 (Tex.Civ.App.1978), *superseded by statute on other grounds as stated in Freedman v. Univ. of Houston*, 110 S.W.3d 504, 507–08 (Tex.App.2003); *Rourke v. Garza*, 511 S.W.2d 331, 343 (Tex.Civ.App.1974) ("It is well settled that the phrase 'subject to' are words of limitation and do not create any affirmative contractual obligations."), *aff'd*, 530 S.W.2d 794 (Tex.1975). Consequently, the Warrant Certificate merely evidences ownership of the Warrants and does not diminish or limit a Warrant holder's right to exercise its Warrants for the merger consideration at a time of its choosing.

16. The uncontradicted evidence established that the merger structure was intended to, and did in fact, operate as a call and redemption of the Warrants, and caused the Warrants to be extinguished. While any Warrants not converted to Southern Mineral stock and then to the merger consideration remained outstanding, they became simply the right to obtain $.50 per Warrant, without interest, in perpetuity. They ceased to be securities convertible into equity securities. The Warrant Agreement did not contain a provision authorizing Southern Mineral or Petro-Corp to call or redeem the Warrants. The Warrant Agreement provided that the Warrants were perpetual and would not expire.

17. The credible testimony of the witnesses including the testimony by Mr. Christopher and the plaintiffs, together with the contemporaneous documents demonstrating that the merger was structured so that the Warrants would not survive, demonstrate that the Warrants were redeemed, called, and extinguished in the merger even though they could continue to exist as different instruments—namely, the right to obtain $.50 per Warrant, without interest, in perpetuity.

18. The forgoing factual findings and legal conclusions necessarily support the conclusion that PetroCorp breached the Warrant Agreement by failing to make lawful and fair provision for the Warrant holders to have the ability to convert their Warrants into any or all of the merger consideration for the duration of their Warrants.

*The Affirmative Defenses to the*
*Plaintiffs' Contract Claims*
*Are Meritless*

*Lack of Standing*

19. PetroCorp asserts that the plaintiffs lack standing to maintain their claims because they turned in their Warrants for the $.50 redemption price. There is no merit to this argument. PetroCorp breached the Warrant Agreement on June 6, 2001 when it merged with Southern Mineral in a transaction that breached the terms of the Warrant Agreement. Thereafter, any holder of the Warrants had an obligation to mitigate damages by accepting the merger consideration rather than simply keeping the warrants, which would not be redeemed for more than $.50 per Warrant. Any Warrant holder would lose the true value of their investment in the Warrants by not redeeming them because PetroCorp

would pay only $.50 per Warrant no matter how long they were held.

20. "[T]he long-standing law of [Texas] requires a claimant to mitigate damages if it can do so with trifling expense or with reasonable exertions." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex.1999) (internal quotation marks omitted). The plaintiffs adhered to the mitigation principles established by Texas law when they redeemed the maximum number of Warrants possible at the only price available, $.50.

21. A party to a lawsuit does not forfeit standing to maintain an action for damages because it mitigated damages from a breach of contract. *See id.* at 858–59.

### Estoppel and Related Defenses

22. PetroCorp claims that the "plaintiffs are estopped to maintain their claims, having purchased their warrants knowing the terms and provisions of the merger agreement respecting the warrants." (AJPO ¶ iv(b)(4).) This is not so.

23. The elements of estoppel under Texas law are: (a) conduct by one party inducing the other to change its position in reliance thereon; and (b) "allow[ing] the first party to later disavow that conduct would cause substantial hardship to the second party." *Schwartz v. NMS Indus., Inc.*, 517 F.2d 925, 929–30 (5th Cir.1975). Here, the plaintiffs' Warrant purchases did not cause the defendants to change their position concerning the merger's treatment of the Warrants and the defendants suffered no hardship as a result of those purchases. Moreover, all of the plaintiffs' Warrants purchases, including those made on behalf of Millenco, were made with the belief that the merger's treatment of the Warrants was contrary to the terms of the Warrant Agreement; neither the plaintiffs nor Millenco

intended to give up the present claims by purchasing the Warrants or turning them in for redemption.

24. The Court of Appeals for the District of Columbia Circuit rejected an argument similar to PetroCorp's estoppel defense in the context of an action where the plaintiff purchased warrants knowing that the announced terms of a merger breached the warrant agreement. *See Gandal,* 23 F.3d at 543–46. *Gandal* found that the defendants' estoppel defense had no application to a breach of contract action. *See id.* at 544. The Court of Appeals concluded that "[a] warrant agreement provides the holder with a bundle of rights, and we see no reason why the transferability of those rights should be limited." *Id.* The Court of Appeals also disposed of a variant of the estoppel argument, *i.e.,* that the plaintiff assented to the defendants' treatment of the warrants by purchasing them after the announced terms of the merger:

[The mutual assent] doctrine prevents a party who after accepting another party's idiosyncratic interpretation of a contract term, then sues to recover damages based on a more natural construction of the term. This scenario assumes a traditional bilateral contract arrangement and necessarily implies not only that a party state its interpretation of the contract term clearly, but also that the other side manifest its assent to that interpretation. *The doctrine therefore has no application in the context of a transferable contract like a warrant agreement.* Gandal bought the warrants from a third party and neither Gandal nor the third party ever specifically agreed to Blair's interpretation of the contract.... *The district court correctly observed that Telemundo's suggested construction of the mutual assent doctrine would allow a corporation to breach the warrant agreement*

*lawfully, at least as to after-acquired warrants, simply by declaring its intention to do so, which would neatly destroy the market in warrants ....*

*Id.* at 545–46 (internal citations omitted) (emphasis added). Therefore, PetroCorp's estoppel defense is meritless.

*Article 8   of the Texas*

*Uniform Commercial Code*

■ 25. The defendants also argue that § 8.302(a) of the Texas Uniform Commercial Code precludes the plaintiffs from bringing any breach of contract claims based on the Warrants that the plaintiffs purchased after the date of the breach. The defendants contend that the right to bring claims for a breach of the Warrant Agreement was not transferred with the Warrants when the plaintiffs purchased them. The argument is unavailing.

26. Section 8.302(a) of the Texas UCC provides, in relevant part, that: "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer." Tex. Bus. & Comm.Code § 8.302(a) (Vernon 2004). The Warrants were certificated securities and represented by the Warrant Certificate. *See* Tex. Bus. & Comm.Code § 8.102(a)(4) (Vernon 2004).

27. The defendants argue that the right to bring a claim for breach of the Warrant Agreement is not a right "in the security" and thus was not automatically transferred to the plaintiffs when they purchased the Warrants after the date of the breach. The defendants concede, however, that they have not been able to locate any cases interpreting § 8.302(a) of the Texas UCC. (*See* PetroCorp's Proposed Findings of Fact and Conclusions of Law ¶ 53.) This Court's recent decision in *Consolidated Edison, Inc. v. Northeast Utilities*, 318 F.Supp.2d 181 (S.D.N.Y.2004),

which interprets § 8–302 of the New York UCC—a provision identical to § 8–302 in the Texas UCC—undermines the defendants' position. In *Consolidated Edison,* the Court concluded that "rights in the security" includes rights "vis-a-vis the issuer and vis-a-vis other potential holders," and that the rights against the issuer include contract rights. *Id.* at 192. The Court noted that "[a] holder's rights in the security thus include the rights against the issuer under the contract embodied in the security as supplemented by federal and state law." *Id.*

28. In this case, the plaintiffs' claims for breach of the Warrant Agreement based on Warrants purchased after the breach are asserted against the issuer of the Warrants and are based on the Warrant Agreement. The Warrant Certificate states that it is "subject to" the terms of the Warrant Agreement. PetroCorp is the successor-in-interest of Southern Mineral and has assumed Southern Mineral's obligations as the issuer of the Warrants under the Warrant Agreement. The Warrants are a contract between PetroCorp and the Warrant holders that provide rights through the terms of the Warrant Certificate and the Warrant Agreement. The Warrant holders' rights in the Warrants "thus include the rights against the issuer [here, Petrocorp] under the contract embodied in the security [here, the Warrant Agreement] as supplemented by federal and state law." *Consolidated Edison,* 318 F.Supp.2d at 192. The plaintiffs therefore have the right under § 8.302 of the Texas UCC to assert claims for breach of the Warrant Agreement against PetroCorp as the issuer of the Warrants.

29. Significantly, the Warrant Agreement provides that "all covenants, conditions, stipulations, promises, and agreements in this Agreement contained shall be for the sole and exclusive benefit of the

parties hereto and their successors and the holders of the Warrant Certificates." (PXI § 6.13.) That provision also limits to the "parties hereto and the holders of the Warrant Certificates any right, remedy, or claim under or by reason of this Agreement...." (*Id.*) The Warrant Agreement thus authorizes holders of the Warrants, without limitation, to maintain a legal proceeding for breach of that Agreement. Neither the Warrant Agreement itself nor § 8.302 of the Texas UCC prevents the plaintiffs from bringing claims against PetroCorp as successor-in-interest to Southern Mineral based on Warrants that were purchased after the date of the breach of the Warrant Agreement.[10]

### The Plaintiffs' Claim for a Declaratory Judgement (Count III)

30. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides, with exceptions not relevant here, that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). "The two criteria guiding the policy in favor of rendering declaratory judgments are (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether

it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani,* 915 F.Supp. 622, 631 (S.D.N.Y. 1996); *see also Absolute Resource,* 76 F.Supp.2d at 735. "If either prong of this test is met, the request for a declaratory judgment should be entertained." *Giuliani,* 915 F.Supp. at 631.

31. As set forth above in discussing the plaintiffs' breach of contract claims, a declaratory judgment will both clarify and settle the legal relations between the parties and also terminate and afford relief from the uncertainty, insecurity, and controversy that gave rise to this action.

32. The plaintiffs are therefore entitled to a declaratory judgment that PetroCorp breached the Warrant Agreement by: (a) failing to provide the Warrant holders with the option to exercise their Warrants into any or all of the merger consideration, at a time of the Warrant holders' choosing, after the merger; (b) calling, redeeming and extinguishing the Warrants, and causing the Warrants to expire in the merger; and (c) failing to make lawful and fair provision for the Warrant holders to receive all of the merger consideration for the duration of the Warrants.

### The Plaintiffs' Claim for Tortious Interference with the Warrant Agreement (Count V) [11]

33. To establish a claim of tortious interference with contract under Texas law, a party must establish:

---

**10.** It is unnecessary to determine whether any claims by the plaintiffs directly against PetroCorp, rather than against PetroCorp as successor-in-interest to Southern Mineral (the issuer of the Warrants), for causing the breaches of the Warrant Agreement and for having tortiously interfered with the Warrant Agreement, passed with those Warrants which were purchased by the plaintiffs after the breach of the Warrant Agreement. This is so because the measure of damages for

breach of contract and tortious interference with contract are the same, and the plaintiffs can recover their full measure of damages against PetroCorp as the successor-in-interest to Southern Mineral, the issuer who breached the Warrant Agreement, and those claims against the issuer plainly passed with the Warrants that the plaintiffs purchased after the breach.

**11.** The plaintiffs withdrew Count IV for unjust enrichment. (JPTO ¶ iv(a)(5).)

(1) the existence of a contract subject to interference; (2) willful and intentional interference with that contract; (3) the intentional interference was a proximate cause of plaintiff's damage; and (4) actual damage or loss occurred.

*Wardlaw v. Inland Container Corp.,* 76 F.3d 1372, 1375 (5th Cir.1996).

34. "Intentional interference does not require an intent to injure, only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it. 'Substantially certain' requires that the interference be incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *Id.* at 1375–76 (internal quotation marks and citations omitted).

35. Here, the evidence firmly established that PetroCorp tortiously interfered with the Warrant Agreement. Mr. Christopher's testimony, and the documents reflecting the merger negotiations between Southern Mineral and PetroCorp, (*see, e.g.,* PX9—PX12), establish that PetroCorp was fully aware that the Warrant Agreement required PetroCorp to assume the Warrants and permit them to remain as options exercisable into the merger consideration, including PetroCorp stock. However, PetroCorp refused to merge with Southern Mineral if any Warrants remained outstanding and exercisable into the stock consideration. As testified by Mr. Christopher and Mr. Luttrell, PetroCorp's assumption of the Warrants was a potential "deal breaker."

36. Southern Mineral's executives were anxious to merge with PetroCorp and complied with PetroCorp's demand that the Warrants be extinguished in the merger. PetroCorp used this anxiety to its advantage and deliberately created a merger structure that prevented the Warrants from being convertible into the stock component of the merger consideration after June 5, 2001.

37. PetroCorp's interference with RAMLP's, WSC's and Millenco's rights under the Warrant Agreement artificially depressed the trading price of the Warrants between December 22, 2000 and June 7, 2001. PetroCorp's interference also extinguished and caused the expiration of the Warrants themselves. Due to PetroCorp's interference with the Warrant holders' contract rights, the plaintiffs and Millenco were prevented from: (a) selling the Warrants at a market price that reflected the Warrants' actual value; and (b) exercising their right to convert the Warrants into the merger consideration, including PetroCorp stock, at a time of their choosing. As discussed below, the plaintiffs and Millenco have been damaged in the amount of the fair value of the Warrants on June 6, 2001.

### PetroCorp's Justification Affirmative Defense is Meritless

38. PetroCorp has not established the affirmative defense of justification. "Texas law ... provides the affirmative defense of justification to interference torts where the interfering party acts in *bona fide* exercise of a legal right." *George v. Nat'l Ass'n of Letter Carriers,* 185 F.3d 380, 392 (5th Cir.1999).

39. The testimony and documentary evidence demonstrates that PetroCorp was fully aware that the Warrant Agreement required that the Warrant holders receive the option to exercise their Warrants into the stock consideration at a time of their choosing. PetroCorp also knew that the Warrants could not be called, redeemed, or extinguished in the merger or at any other time. Nevertheless, PetroCorp structured the merger to take away the Warrant holders' right to exercise Warrants for the

stock portion of the merger consideration after June 5, 2001. PetroCorp also caused the Warrants to be called, redeemed, and extinguished in clear violation of the Warrant Agreement. PetroCorp did not have a *bona fide* legal right to interfere with the Warrant Agreement.

40. The evidence demonstrates that PetroCorp knew that it did not have a colorable argument that the merger structure was consistent with the terms of the Warrant Agreement. PetroCorp did not receive a written opinion of counsel that its treatment of the Warrants was in conformity with the Warrant Agreement's requirements. (Tr. at 190–92 (Christopher).) PetroCorp was also advised by Southern Mineral that the Warrants were perpetual and that they could not be abrogated. (PX10.) Nevertheless, PetroCorp, for its own reasons, was unwilling to enter into a transaction that left the Warrants outstanding and therefore structured a transaction to eliminate them. Under the circumstances, PetroCorp did not act in a good faith, but mistaken, belief that the various breaches of the Warrant Agreement were justified. Consequently, PetroCorp has not established a justification defense sufficient to defeat the plaintiffs' claim for tortious interference with the Warrant Agreement.

### Damages (For Breach of Contract and Tortious Interference with the Warrant Agreement)

### General Principles

41. The Court of Appeals for the Fifth Circuit has set forth the measure of contract damages under Texas law as follows:

> [T]he rules for contract damages are intended to place the victim of the breach in the same position he would have occupied had the breach not occurred. There are three principal elements to such damages: (1) general dif-ference-in-value losses—the difference in value to the wronged party of the performance or goods tendered and the performance or goods as promised under the contract; (2) incidental losses—costs incurred in a reasonable effort ... to avoid losses caused by the breach; and (3) consequential losses—items such as lost profits or injuries to person or property foreseeably caused by the breach.

*Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1079 (5th Cir.1985) (internal citations omitted).

42. In Texas, it is a "general rule that damages for breach of contract are measured by the value of the good bargained for at the time of breach." *Miga v. Jensen*, 96 S.W.3d 207, 214 (Tex.2002); *see Walden v. Affiliated Computer Serv., Inc.*, 97 S.W.3d 303, 329 (Tex.App.2003) ("The ultimate goal in measuring damages for a breach-of contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach."). "The basic measure of actual damages in an action for tortious interference with contract is the same as the measure of damages for breach of the contract at issue." *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 219 (Tex.App. 2001). The plaintiffs' damages are measured by the value of the Warrants—which represent the right to buy stock at an undetermined future date—on June 6, 2001.

43. PetroCorp, as the party breaching the Warrant Agreement, "cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Buchanan v. Dowdy*, 772 F.Supp. 968, 974 (S.D.Tex.1991) (internal quotation marks omitted). "Such exactitude of proof is not required. . . . The fact that . . . damages are difficult to measure

and by their nature are uncertain in amount does not render such damages unrecoverable." *Mechanical Wholesale, Inc. v. Universal–Rundle Corp.,* 432 F.2d 228, 231 (5th Cir.1970).

*Miga and Hermanowski*

44. The Texas Supreme Court has recently applied these rules to a claim for damages based on the breach of a stock option contract. *Miga v. Jensen,* 96 S.W.3d 207 (Tex.2002). In that case, the defendant breached the option contract by refusing to deliver shares of stock on the date that the plaintiff exercised his options. *Id.* at 209–10. The Court held that "because [defendant] Jensen breached the contract on the same day [plaintiff] Miga attempted to exercise his option, the correct measure of damages for Jensen's failure to perform on his promise is the traditional one: 'the difference between the price contracted to be paid and the value of the article at the time when it should [have been] delivered....' " *Id.* at 215 (citations omitted)

45. The court in *Miga* relied on cases decided by the New York Court of Appeals and the Second Circuit Court of Appeals to support its decision. The court in *Miga* stated:

> Measuring these damages at the time of breach also has the support of other jurisdictions. The New York Court of Appeals, after noting that "[t]he proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach," held that "[t]he rule is precisely the same when the breach of contract is nondelivery of shares of stock."
>
> As the Second Circuit has reasoned, "[m]easuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into

account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce." For this reason, New York courts have "explicitly upheld damage awards based on what 'knowledgeable investors anticipated the future conditions and performance would be at the time of the breach' and have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight." Thus, the "damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach."

*Id.* (quoting *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 26 (1971) and *Sharma v. Skaarup Ship Mgm't Corp.,* 916 F.2d 820, 825–26 (2d Cir.1990)) (footnotes omitted).

46. The Texas Supreme Court noted, however, that determining the value of an unexercised option on the date of breach was an altogether different exercise than the matter before it. *Id.* at 215–216. The court stated:

> Calculating the value of an unexercised option can be a complicated enterprise, requiring the application of finance models to determine the present value of the right to purchase stock at a fixed price at some future time. But when, as here, breach occurs when the option holder seeks to exercise the option, the option becomes a straightforward contract to sell a certain amount of stock at a certain price at the time chosen by the holder. When Miga attempted to exercise his option in December 1994, the time for delivery was set; at that

point, the option simply represented Jensen's promise to sell Miga 4.8% of his interest in PGE at Jensen's original cost. Jensen failed to deliver the stock when he should have, and damages for failure to deliver stock, like failure to deliver other marketable goods, are measured precisely as they were 150 years ago: the difference between the value of the goods bargained for and the contract price at the time set for delivery.

*Id.*

47. Similarly, in *Hermanowski v. Acton Corp.*, 580 F.Supp. 140 (S.D.N.Y.1983), *aff'd*, 729 F.2d 921 (2d Cir.1984), the court found that a stock option contract was breached "when, on November 12, 1979, the defendants rejected the plaintiff's exercise of his option to purchase 5,000 shares and returned his check for $10,000." *Id.* at 143. *Hermanowski* measured the plaintiff's damages as the difference between the market price of the stock on the date that the defendant refused delivery and the exercise price of the option. *See id.* at 145–46. The Second Circuit Court of Appeals affirmed the lower court's damages methodology. *See Hermanowski v. Acton Corp.*, 729 F.2d 921 (2d Cir.1984); *see also Scully v. U.S. WATS, Inc.*, 238 F.3d 497, 504, 507–12 (3d Cir.2001) (damages measure was difference between exercise price of option and value of underlying stock on date of the plaintiff's exercise of option and the defendants' rejection thereof).

48. The present dispute does not involve PetroCorp's failure to deliver stock upon the exercise of their Warrants by the plaintiffs and Millenco. The plaintiffs do not contend that PetroCorp breached the Warrant Agreement by the failure to deliver stock on the date of the breach, but rather that PetroCorp terminated the perpetual nature of the Warrants on that date. In fact, the plaintiffs and Millenco never exercised their Warrants; they tendered their Warrants for redemption in December, 2001, and January, 2002, to mitigate damages and put their capital to other, more productive, uses. Accordingly, the measure of damages in both *Miga* and *Hermanowski*—the difference between the market value of stock on the date that options were exercised and the strike price of the options—is not applicable to this case. Instead, the Court must engage in a more "complicated exercise" of valuing unexercised Warrants on the date of breach. *See Miga*, 96 S.W.3d at 215–16.

### Damages Calculated as of Date of Breach

49. Southern Mineral breached the Warrant Agreement on June 6, 2001. PetroCorp is liable for that breach as the successor to Southern Mineral and in its own right for having caused it. On that date, the Warrants were no longer exercisable into the stock component of the merger consideration and had been called, redeemed, and extinguished.

50. The value of the Warrants on June 6, 2001, the date of the breach, was established by the credible testimony of Mr. Mackie, who testified as an expert. At trial, the Court found that Mr. Mackie could "plainly testify as an expert in the field of valuation of warrants, based upon his training and long experience in dealing with and valuing warrants...." (Tr. at 673 (Court).) PetroCorp did not offer an expert to rebut Mr. Mackie's testimony.

51. Mr. Mackie's credible testimony—which was supported by Mr. Morris' testimony and the E & Y Valuation Analysis—establishes that after the merger announcement on December 22, 2000, the trading market for the Warrants was artificially depressed due to publicly available news that the Warrants could only be exchanged for $.50 in cash after the merger

election period. Mr. Mackie's testimony also demonstrates that the Warrants would have traded at approximately one-half the price of Southern Mineral's stock if they had remained exercisable into the stock component of the merger consideration. (Tr. at 669–71 (Mackie), 723 (Mackie).)

52. PetroCorp did not offer any persuasive evidence to support its theory that market prices after announcement of the merger accurately reflected the value of the Warrants—even if the Warrants remained exercisable into the stock consideration at a time of the Warrant holders' choosing. In fact, Mr. Morris' testimony and E & Y's Valuation Analysis itself strongly suggest that the Warrants would have traded at higher prices in tandem with Southern Mineral's stock had they remained exercisable into the stock consideration.

53. Courts recognize that the "price" and "value" of a security "are not necessarily synonymous" and that "under certain circumstances market price may not adequately reflect true value of a security." *Mathias v. Jacobs*, 238 F.Supp.2d 556, 576 (S.D.N.Y.2002). The fair market value of a security means "neither panic value, auction value, speculative value, *nor a value fixed by depressed or inflated price*, and ... the true measure resides in an estimate of what is the fair, economic, just and equitable value *under normal conditions.*" *Id.* at 576 (internal quotation marks omitted) (emphasis in original).

54. The market for the Warrants after the merger announcement did not reflect normal conditions. Instead of trading at higher prices along with Southern Mineral's stock, the Warrants traded in a range between $.49 and $.59 cents. Mr. Mackie's uncontradicted testimony established that under normal conditions, the Warrants would have traded at substantially higher prices. This did not occur because the marketplace had been informed that the Warrants would not survive the merger. PetroCorp's argument that the post-December 22, 2000 market for the Warrants accurately reflected their value is therefore incorrect. The market after the merger announcement mispriced the Warrants because it did not—and could not—take into account that the Warrants should have survived the merger to remain exercisable into the stock portion of the merger consideration.

55. Mr. Mackie testified that he used the Black–Scholes pricing model to establish the fair value of the Warrants because: (a) the post-announcement market for the Warrants was artificially capped; and (b) the Warrants did not survive the merger as options to exercise into stock consideration. The Court agrees that the post-announcement market was artificially deflated, and it is not disputed that the Warrants were not exercisable into PetroCorp stock after the merger.

56. Mr. Mackie then testified that under these circumstances the Black–Scholes model was the best independent means to establish a value for the Warrants. Mr. Mackie's testimony concerning the Black–Scholes model, and his reports using the model, establish that the Black–Scholes model has been: (a) subject to testing and found reliable; (b) received favorable commentary; and (c) widely used by traders of derivative securities and publically traded corporations that issue such securities. Mr. Mackie has used the Black–Scholes model to value warrants for approximately 19 years. RAMLP used the model to evaluate every warrant that it had an interest in trading. The Black–Scholes model "was developed in 1971 by economists Fisher Black and Myron Scholes, for which they were awarded the Nobel Prize in 1997." *Mathias*, 238 F.Supp.2d at 574 n. 12.

57. Significantly, Mr. Morris testified that the Black–Scholes model was generally accepted in the practice of valuing warrants. He also testified that E & Y was able to confirm Mr. Mackie's valuation conclusions concerning the Warrants when performing a Black–Scholes valuation using Mr. Mackie's assumptions. In fact, when using a ten-year duration for Warrants, E & Y's Black–Scholes calculation established that the Warrants had a fair value of $2.21 on June 6, 2001. (PX115 at p. 44.) This value is quite close to the $2.32 (not prorated) and $1.96 (prorated) fair values established by Mr. Mackie using the Black–Scholes model.

58. Mr. Mackie testified credibly that the fair value of the Warrants as calculated by Black–Scholes was consistent with: (a) his perception of the Warrants' value based on his long experience trading and valuing warrants; and (b) the Warrant values generated by his proprietary valuation models. Based on all of the evidence set forth above, the Court finds that the Black–Scholes model employed by Mr. Mackie—and his opinion of the Warrants' value based thereon—meet the test for reliability under Federal Rule of Evidence 702 and as set forth in *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. *See id.* at 592–94, 113 S.Ct. 2786; *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Mr. Mackie's valuation reports and testimony are relevant because they assist the Court in understanding the plaintiffs' damage evidence and determining the amount of the plaintiffs' damages. Fed.R.Evid. 702.

59. PetroCorp's argument that an analysis of the Warrants' value using Black–Scholes is unnecessary because the market accurately valued the Warrants on June 6, 2001 is rejected. For the reasons explained above, the Court finds that the market did not accurately value the Warrants on that date.

60. Based on his first report, Mr. Mackie opined that the fair value of the Warrants was $2.32 as of June 6, 2001. This opinion of the Warrants' fair value did not take proration into account because two Southern Mineral shareholders and their affiliated corporations executed agreements enabling them to avoid proration of the PetroCorp stock which they received in the merger. The plaintiffs argue that in accordance with Section 3.3 of the Warrant Agreement, when PetroCorp permitted some Southern Mineral shareholders to avoid proration, it was also required to allow the Warrant holders to avoid proration, too.

61. The Court disagrees with the plaintiffs' contention that Section 3.3 requires the Warrant holders be permitted to avoid proration of PetroCorp stock. The Warrant Agreement does not require PetroCorp to enter into agreements to avoid proration as it did with the Southern Mineral shareholders in question. Moreover, those shareholders provided additional value to PetroCorp by agreeing to tender all of their shares. Because the Warrant Agreement does not require PetroCorp to provide the Warrant holders with the ability to avoid proration, PetroCorp could properly furnish the Warrant holders with its stock on a prorated basis. Accordingly, the plaintiffs are required to take proration into account in determining the fair value of their Warrants.

62. Mr. Mackie also opined that on a fully prorated basis, the Warrants had a fair value of $1.96 on June 6, 2001. This conclusion is rooted in a Black–Scholes model but, taking all of Mr. Mackie's assumptions into account, is actually a conservative analysis.

63. The Court accepts Mr. Mackie's opinion that the fair value of the Warrants on June 6, 2001 is $1.96. RAMLP (on its own behalf and as Millenco's assignee) and WSC are entitled to damages in the amount of $1.96 per Warrant. Because the Warrants were freely transferable, the Court includes the Warrants purchased from third-parties after the merger in its calculation of damages. The Warrants that RAMLP sold to Millenco after the merger, and that RAMLP sold to and bought back from Mr. Mackie, are also included in the damages calculation because the parties to those transactions clearly understood that those Warrants might be subject to a lawsuit, and it is the ultimate Warrant holders whose Warrants were redeemed by PetroCorp who have the right to sue for the breach of the Warrant Agreement relating to those Warrants.

64. Because the Warrants were not subject to any restrictions on transfer, there is no need to adjust the plaintiffs and Millenco's Warrant holdings to reflect their actual Warrant purchases as of June 6, 2001. Accordingly, the Court awards damages based on the number of Warrants that the plaintiffs and Millenco tendered for redemption in December 2001 and January 2002. The plaintiffs are entitled to damages based on the $1.96 fair value of the Warrants on June 6, 2001 after subtracting the $.50 redemption price as follows:

(a) $301,649.14—RAMLP (206,609 Warrants)

(b) $1,320,570.00—RAMLP (as Millenco's assignee) (904,500 Warrants)

(c) $293,127.12—WSC (200,772 Warrants)

(d) $1,915,346.26 Total Damages

65. The plaintiffs also are entitled to receive pre- and post-judgment interest and costs.

*Attorneys' Fees*

66. Under Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (Vernon 2004), "when a prevailing party in a breach of contract suit seeks [attorneys'] fees, an award of reasonable fees is mandatory, as long as there is proof of reasonable fees ... and the plaintiff has been awarded damages...." *Mathis v. Exxon Corp.*, 302 F.3d 448, 462 (5th Cir.2002) (citations omitted). The plaintiffs are entitled to attorneys' fees under this statute. Because there are no submissions thus far with respect to the amount of such fees, the plaintiffs, if the amount of fees is disputed, should follow the procedure provided in Federal Rule of Civil Procedure 54(d)(2) for the determination of attorneys' fees following the entry of judgment.

## CONCLUSION

For the reasons explained above, the plaintiffs are entitled to a judgment in the total amount of $1,915,346.26 together with pre-judgment interest. Costs and attorneys' fees will be determined after judgment is entered pursuant to Federal Rule of Civil Procedure 54(d). Interest will accrue on the judgment. The plaintiffs are directed to submit a proposed judgment within seven (7) days. The defendants may file any objections two (2) days thereafter.

**SO ORDERED.**